******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* ANDREW DICKSON
(SC 19385)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued December 11, 2015—officially released August 9, 2016*

*Andrew S. Liskov*, for the appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Joseph T. Corradino*, senior assistant state's attorney, for the appellee (state).

*Charles D. Ray*, *James L. Brochin*, *Marques S. Tracy* and *Laura E. Sedlak* filed a brief for The Innocence Project as amicus curiae.

*Opinion*

ROGERS, C. J. The issue that we must resolve in this certified appeal is whether we should overrule this court's holding in *State* v. *Smith*, 200 Conn. 465, 469, 512 A.2d 189 (1986),[1] and hold that inherently suggestive in-court identifications are inadmissible even in the absence of a suggestive pretrial identification procedure. The defendant, Andrew Dickson, was charged with a variety of offenses after he shot the victim, Albert Weibel, during an attempted robbery. Before trial, the defendant filed a motion to preclude Weibel from making an in-court identification of the defendant on the ground that in-court identification procedures are unnecessarily suggestive. In the alternative, the defendant requested that the trial court require that Weibel select him from a group of individuals of similar appearance. The trial court denied the motion pursuant to *Smith*, and Weibel identified the defendant as his assailant in court. The jury found the defendant guilty of assault in the first degree and conspiracy to commit robbery in the first degree, and the trial court rendered judgment accordingly.

Thereafter, the defendant appealed to the Appellate Court claiming, among other things, that the trial court had abused its discretion by denying his motion to preclude Weibel's in-court identification of him or, in the alternative, to order an alternative identification procedure. The Appellate Court rejected the defendant's claim pursuant to *Smith*; *State* v. *Dickson*, 150 Conn. App. 637, 644–47, 91 A.3d 958 (2014); and, having also rejected the defendant's other claims on appeal, affirmed the judgment of conviction. Id., 654.

We then granted the defendant's petition for certification to appeal, limited to the following issues: (1) "Did the Appellate Court properly determine that the in-court identification procedure used at trial was proper under this court's decision in *State* v. *Smith*, [supra, 200 Conn. 465], and, if so, should the *Smith* precedent be overturned?"; and (2) "If we conclude that the in-court identification was improper, was the impropriety harmless in light of the other state's evidence?" *State* v. *Dickson*, 314 Conn. 913, 100 A.3d 404 (2014). We conclude that, contrary to our holding in *Smith*, in cases in which identity is an issue, in-court identifications that are not preceded by a successful identification in a nonsuggestive identification procedure[2] implicate due process principles and, therefore, must be prescreened by the trial court.[3] We also conclude that the admission of the in-court identification here was harmless and, accordingly, affirm the judgment of the Appellate Court on this alternative ground.

The record reveals the following facts that the jury reasonably could have found and procedural history. Akeem Lyles arranged to meet Weibel and Matthew

Shaw at Terrace Circle in Bridgeport on the night of January 9, 2010, for the purpose of selling them an all-terrain vehicle. Shortly before the arranged meeting time, Lyles met with Jovanni Reyes and the defendant in a nearby apartment, explained that he planned to rob Weibel and Shaw and asked Reyes and the defendant if they would help him. Reyes and the defendant agreed. The three men left the apartment armed with guns at approximately 9:30 p.m. At that point, Weibel, who was in a pickup truck with Shaw at the arranged meeting place, called Lyles. Lyles told Weibel that he was outside in back of the building with the all-terrain vehicle and that Weibel should come and "check it out." As Weibel approached Lyles, Lyles put a gun to Weibel's head and demanded money. Weibel then turned around and saw Reyes and the defendant with guns. They also demanded money. As Weibel covered his head, called for help and attempted to return to the pickup truck, the men hit him, demanded money and took his cell phone.

Lyles then broke from the group and approached the pickup truck. He tapped on the window with his gun and pointed the gun at Shaw's head. Shaw got out of the pickup truck and Lyles grabbed him, threw him against a parked car and demanded "the money." When Shaw told Lyles that he did not have the money, Lyles took Shaw's cell phone and wallet. Lyles also took between $40 and $50, an iPod and a global positioning system from the pickup truck. Someone then yelled "this is taking too long" and Lyles and Reyes ran from the scene. At that point, the defendant held a gun to Weibel's head, threw him against a dumpster near the pickup and said, "You're a dead man." The defendant then shot Weibel in the leg and neck. Weibel was seriously injured but survived. When Lyles later asked the defendant why he had shot Weibel, the defendant replied, "because we didn't get any money."

Approximately one year after the shooting, Weibel viewed a police photographic array that included a photograph of the defendant, but he was unable to identify the defendant as his assailant. Both Weibel and Shaw, however, were able to identify Lyles from a photographic array as the person who had first approached Weibel and who had approached Shaw while he was in the pickup truck.

The defendant was arrested and charged with numerous offenses arising from the incident. Before trial, the defendant filed a motion in limine in which he contended that any in-court identification of the defendant by Weibel would be so highly and unnecessarily suggestive and conducive to an irreparable misidentification of the defendant as to violate the defendant's due process rights under article first, § 8, of the Connecticut constitution. In the alternative, the defendant, who is African-American, requested that the court order that Weibel be required to select him from a group of individuals

of similar age, weight, height, complexion and hair style. The defendant orally renewed the motion in limine after the jury was selected and before the presentation of evidence. The trial court denied the motion.

At trial, the prosecutor asked Weibel if he saw the person who had shot him in court. Weibel responded in the affirmative and identified the defendant, who was sitting next to counsel at the defense table. Except for a judicial marshal who was in uniform, the defendant was the only African-American male in the courtroom. The jury found the defendant guilty of assault in the first degree and conspiracy to commit robbery in the first degree, and the trial court rendered judgment accordingly.

On appeal to the Appellate Court, the defendant claimed that the trial court had violated his due process rights under the fifth and fourteenth amendments to the federal constitution when it denied his motion in limine.[4] *State* v. *Dickson*, supra, 150 Conn. App. 642–43. The Appellate Court rejected this claim pursuant to *State* v. *Smith*, supra, 200 Conn. 469–70; *State* v. *Dickson*, supra, 644; and affirmed the judgment of conviction. *State* v. *Dickson*, supra, 654. This appeal followed.

The defendant contends that the Appellate Court improperly concluded that Weibel's in-court identification of the defendant as his assailant was admissible under *Smith*.[5] In the alternative, he claims that this court should overrule *Smith* and hold that first time in-court identifications trigger due process protections because they are inherently suggestive and are the result of state action.[6] Finally, he claims that the state cannot prove that the improper admission of the in-court identification was harmless beyond a reasonable doubt.

I

DEFENDANT'S CLAIM THAT FIRST TIME IN-COURT
IDENTIFICATIONS IMPLICATE DUE
PROCESS PRINCIPLES

To provide context for the defendant's claims, we begin our analysis with an overview of the legal principles governing the admission of eyewitness identification testimony. In the absence of unduly suggestive procedures conducted by state actors, the potential unreliability of eyewitness identification testimony ordinarily goes to the weight of the evidence, not its admissibility, and is a question for the jury. See *Perry* v. *New Hampshire*,     U.S.     , 132 S. Ct. 716, 730, 181 L. Ed. 2d 694 (2012) ("we hold that the [d]ue [p]rocess [c]lause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement"). Principles of due process require exclusion of unreliable identification evidence that is not the result

of an unnecessarily suggestive procedure "[o]nly when [the] evidence is so extremely unfair that its admission violates fundamental conceptions of justice . . . ." (Citation omitted; internal quotation marks omitted.) Id., 723, citing *Napue* v. *Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959) (due process prohibits state's knowing use of false evidence because such use violates any concept of ordered liberty). To assist the jury in determining what weight to give to an eyewitness identification that is not tainted by an unduly suggestive identification procedure, the defendant is entitled as a matter of state evidentiary law to present expert testimony regarding a variety of factors that can affect the reliability of such testimony. *State* v. *Guilbert*, 306 Conn. 218, 248, 49 A.3d 705 (2012) ("[an] expert should be permitted to testify . . . about factors that generally have an adverse effect on the reliability of eyewitness identifications and are relevant to the specific eyewitness identification at issue").

A different standard applies when the defendant contends that an in-court identification followed an unduly suggestive pretrial identification procedure that was conducted by a state actor. In such cases, both the initial identification and the in-court identification may be excluded if the improper procedure created a substantial likelihood of misidentification. *Perry* v. *New Hampshire*, supra, 132 S. Ct. 724. "A primary aim of excluding identification evidence obtained under unnecessarily suggestive circumstances . . . is to deter law enforcement use of improper lineups, showups, and photo arrays in the first place." Id., 726.

"In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances." (Internal quotation marks omitted.) *State* v. *Marquez*, 291 Conn. 122, 141, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009).

The first suggestiveness prong involves the circumstances of the identification procedure itself; id., 142–43; and the critical question is whether the procedure was conducted "in such a manner as to emphasize or highlight the individual whom the police believe is the suspect." Id., 143. If the trial court determines that there was no unduly suggestive identification procedure, that is the end of the analysis, and the identification evidence is admissible. *State* v. *Outing*, 298 Conn. 34, 54, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011).

If the court finds that there was an unduly suggestive procedure, the court goes on to address the second

reliability prong, under which "the corruptive effect of the suggestive procedure is weighed against certain factors, such as the opportunity of the [eyewitness] to view the criminal at the time of the crime, the [eyewitness'] degree of attention, the accuracy of [the eyewitness'] prior description of the criminal, the level of certainty demonstrated at the [identification] and the time between the crime and the [identification]." (Internal quotation marks omitted.) *State* v. *Ledbetter*, 275 Conn. 534, 553, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006), citing *Manson* v. *Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); see *Manson* v. *Brathwaite*, supra, 114 (reliability factors include "the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation"); *Neil* v. *Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972) (same).[7] "[A]n out-of-court eyewitness identification should be excluded on the basis of the procedure used to elicit that identification . . . if the court is convinced that the procedure was so suggestive and otherwise unreliable as to give rise to a very substantial likelihood of irreparable misidentification." (Emphasis omitted.) *State* v. *Marquez*, supra, 291 Conn. 142.

With this general background in mind, we now turn to the case law governing in-court identifications that are not preceded by an unnecessarily suggestive identification procedure, which is the case here. The United States Supreme Court has not yet addressed the question of whether first time in-court identifications are in the category of unnecessarily suggestive procedures that trigger due process protections.[8] See *Galloway* v. *State*, 122 So. 3d 614, 663 (Miss. 2013) ("[t]he United States Supreme Court has not decided whether *Biggers* applies to an in-court identification not preceded by an impermissibly suggestive pretrial identification"), cert. denied, U.S. , 134 S. Ct. 2661, 189 L. Ed. 2d 209 (2014). This court, however, addressed the issue in *State* v. *Smith*, supra, 200 Conn. 467. In that case, this court held that despite the inherent suggestiveness of an in-court identification procedure; id., 468–69 ("[a]ny one-on-one in-court identification of an accused conveys the message that the state has arrested and placed on trial a person it believes has committed the crime"); an in-court identification "need be excluded, as violative of due process, only when it is tainted by an out-of-court identification procedure which is unnecessarily suggestive and conducive to irreparable misidentification." Id., 469; see also *State* v. *Nelson*, 4 Conn. App. 514, 516, 495 A.2d 298 (1985) (where there had been no pretrial out-of-court identification procedure, there was no basis to suppress eyewitness' in-court identification because there would have been nothing to taint it). Thus, under *Smith*, first time in-court identifications

are treated in the same way as identifications that are not tainted by an unnecessarily suggestive identification procedure conducted by a state actor.

The defendant in the present case claims that first time in-court identifications are inherently suggestive and implicate a defendant's due process rights no less than unnecessarily suggestive out-of-court identifications. Accordingly, he contends, such identifications should be subject to prescreening by the court, just like other identifications that are the result of unduly suggestive identification procedures. This is a question of law over which our review is plenary. *Commissioner of Environmental Protection* v. *Farricielli*, 307 Conn. 787, 819, 59 A.3d 789 (2013) ("[w]hether [a party] was deprived of his due process rights is a question of law, to which we grant plenary review" [internal quotation marks omitted]).

We agree with the defendant. First, and most importantly, we are hard-pressed to imagine how there could be a *more* suggestive identification procedure than placing a witness on the stand in open court, confronting the witness with the person who the state has accused of committing the crime, and then asking the witness if he can identify the person who committed the crime.[9] If this procedure is not suggestive, then *no* procedure is suggestive. Indeed, the present case starkly demonstrates the problem, in that Weibel was unable to identify the defendant in a photographic array, but had absolutely no difficulty doing so when the defendant was sitting next to defense counsel in court and was one of only two African-American males in the room. Second, because the extreme suggestiveness and unfairness of a one-one-one in-court confrontation is so obvious, we find it likely that a jury would naturally assume that the prosecutor would not be allowed to ask the witness to identify the defendant for the first time in court unless the prosecutor and the trial court had good reason to believe that the witness would be able to identify the defendant in a nonsuggestive setting. Indeed, such an assumption would be correct in the case of an in-court identification following an unnecessarily suggestive *out-of-court* identification procedure. Thus, a first time in-court identification procedure amounts to a form of improper vouching. See *United States* v. *Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993) ("[v]ouching consists of placing the prestige of the government behind a witness through . . . suggesting that information not presented to the jury supports the [witness'] testimony"). Third, this court previously has recognized that mistaken eyewitness identifications are a significant cause of erroneous convictions; *State* v. *Guilbert*, supra, 306 Conn. 249–50 ("mistaken eyewitness identification testimony is by far the leading cause of wrongful convictions");[10] and the risk of mistake is particularly acute when the identification has been tainted by an unduly suggestive procedure. *United*

*States* v. *Wade*, 388 U.S. 218, 229, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967) ("[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor—perhaps it is responsible for more such errors than all other factors combined" [internal quotation marks omitted]). Fourth, we cannot perceive why, if an in-court identification following an unduly suggestive pretrial police procedure implicates the defendant's due process rights because it is the result of state action, the same would not be true when a prosecutor elicits a first time in-court identification. Cf. *State* v. *Warholic*, 278 Conn. 354, 361, 897 A.2d 569 (2006) (prosecutor's conduct in court can constitute due process violation). Our research has revealed no case holding that this conduct does not constitute state action and, indeed, the state makes no such claim. Fifth, the rationale for the rule excluding identifications that are the result of unnecessarily suggestive procedures—deterrence of improper conduct by a state actor—applies equally to prosecutors.

Accordingly, we conclude that first time in-court identifications, like in-court identifications that are tainted by an unduly suggestive out-of-court identification, implicate due process protections and must be prescreened by the trial court.[11] See *United States* v. *Greene*, 704 F.3d 298, 308 (4th Cir.) (applying *Biggers* constitutional analysis to in-court identification), cert. denied, U.S. , 134 S. Ct. 419, 187 L. Ed. 2d 279 (2013); *United States* v. *Rogers*, 126 F.3d 655, 658 (5th Cir. 1997) (same); *United States* v. *Hill*, 967 F.2d 226, 232 (6th Cir.) ("We hold that the *Biggers* [constitutional] analysis applies to . . . in-court identifications for the same reasons that the analysis applies to impermissibly suggestive [pretrial] identifications. The due process concerns are identical in both cases and any attempt to draw a line based on the time the allegedly suggestive identification technique takes place seems arbitrary. All of the concerns that underlie the *Biggers* analysis, including the degree of suggestiveness, the chance of mistake, and the threat to due process are no less applicable when the identification takes place for the first time at trial."), cert. denied, 506 U.S. 964, 113 S. Ct. 438, 121 L. Ed. 2d 357 (1992); *United States* v. *Rundell*, 858 F.2d 425, 427 (8th Cir. 1988) (noting "suggestiveness inherent in the witnesses' knowing that [the defendant] was the sole [person] charged with the [crime]" and applying *Biggers* factors to in-court identification);[12] *United States* v. *Archibald*, 734 F.2d 938, 943 (witness' in-court identification suggestive when on cross-examination, witness stated he had "feeling he would be sitting next to" defense counsel, and applying *Biggers* factors), modified, 756 F.2d 223 (2d Cir. 1984); E. Mandery, "Due Process Considerations of In-Court Identifications," 60 Alb. L. Rev. 389, 423 (1997) ("[t]here is no sound basis for this distinction" between in-court

identifications and suggestive out-of-court identifications); see also *Commonwealth* v. *Crayton*, 470 Mass. 228, 241–42 and n.16, 21 N.E.3d 157 (2014) (concluding pursuant to "[c]ommon law principles of fairness" that first time in-court identifications are inadmissible except for "good reason," as when identity is not at issue or eyewitness knew defendant before crime [internal quotation marks omitted]). Thus, we conclude that the holding of *Smith* must be limited to its facts, that is, to cases in which the in-court identification has been preceded by an admissible out-of-court identification.[13] We recognize that a number of courts have concluded otherwise.[14] Nevertheless, we conclude that this is an issue for which the arc of logic trumps the weight of authority. For all of the reasons that we have explained, we simply see no reason to distinguish inherently suggestive in-court identifications from inherently suggestive out-of-court identifications.

## II

### STATE'S ARGUMENTS IN SUPPORT OF CLAIM THAT FIRST TIME IN-COURT IDENTIFICATIONS ARE ADMISSIBLE

The state raises numerous arguments in support of its claim to the contrary. We first address the state's claim that our conclusion is inconsistent with the United States Supreme Court's decision in *Perry* v. *New Hampshire*, supra, 132 S. Ct. 716. Specifically, the state contends that the court in *Perry* held that an identification that is the result of an unduly suggestive identification procedure is excludable only when the procedure has been conducted by "law enforcement actors involved in extrajudicial investigation, not prosecutors presenting evidence in court."[15] We disagree. The question of whether a first time in-court identification orchestrated by a prosecutor could trigger due process protections simply was not before the court in *Perry*. Rather, the issue was whether an identification that was the result of suggestive *private* conduct triggered due process protections. *Perry* v. *New Hampshire*, supra, 721. Accordingly, we do not believe that the court's repeated statements that due process protections are triggered only when unduly suggestive identification procedures are arranged by the police means that due process protections are not triggered when state actors other than the police conduct unfair identification procedures. Indeed, the court in *Perry* expressly stated that its prior decisions on this issue "turn on the presence of *state action*"; (emphasis added) id.; and, as we have indicated, the state in the present case does not dispute that a prosecutor's conduct in court constitutes state action. We further note that, since the court's decision in *Perry*, at least one court has assumed that a first time in-court identification triggers due process protections. See *United States* v. *Greene*, supra, 704 F.3d 308 (applying *Biggers* factors

to in-court identification); see also *United States* v. *Correa-Osorio*, 784 F.3d 11, 19–20 (1st Cir. 2015) ("[o]ne could argue either way" whether *Biggers* analysis applies to in-court identifications after *Perry*); *Galloway* v. *State*, supra, 122 So. 3d 663 (as of 2013, "[t]he United States Supreme Court has not decided whether *Biggers* applies to an in-court identification not preceded by an impermissibly suggestive pretrial identification"); but see *United States* v. *Whatley*, 719 F.3d 1206, 1216 (11th Cir.) ("*Perry* makes clear that, for those defendants who are identified under suggestive circumstances not arranged by police [including in-court identifications], the requirements of due process are satisfied in the ordinary protections of trial"), cert. denied,      U.S.     , 134 S. Ct. 453, 187 L. Ed. 2d 303 (2013). Moreover, we are not persuaded by the state's argument that, if a prosecutor's conduct in presenting evidence in court triggers due process protections, the court in *Perry* would have held that the admission of the witness' identification—or, indeed, any potentially unreliable evidence—could be excluded. When, as in *Perry*, a private party was responsible for the suggestiveness of the initial identification procedure, the rationale for the exclusionary rule—deterrence of improper conduct by a state actor—carries no force.

The state also points out that the court in *Perry* specifically referred to in-court identifications when discussing suggestive procedures that do not trigger due process protections. *Perry* v. *New Hampshire*, supra, 132 S. Ct. 727 (The court rejected the defendant's claim that any identification resulting from a suggestive procedure must be prescreened by the court because "[m]ost eyewitness identifications involve some element of suggestion. Indeed, all in-court identifications do."). We agree that one-on-one in-court identifications do not always implicate the defendant's due process rights, as when identity is not an issue or when there has been a nonsuggestive out-of-court identification procedure. As we have indicated, however, the specific question that we are addressing here—whether the trial court is constitutionally required to prescreen *first time* in-court identifications—simply was not before the court in *Perry*. Accordingly, we cannot conclude that the passing, general reference by the court in *Perry* to the propriety of in-court identifications forecloses our conclusion that they can implicate due process concerns under certain circumstances.

The state further claims that in-court identifications do not violate due process principles because they are necessary and, relatedly, because there is no feasible alternative to them. In support of this claim, the state relies on *State* v. *Tatum*, 219 Conn. 721, 725, 595 A.2d 322 (1991), in which the defendant contended that his in-court identification by an eyewitness at trial was tainted by the eyewitness' earlier in-court identification of him, for the first time, at a probable cause hearing.[16]

This court disagreed with the defendant's claim, concluding that, "[i]n order to try the defendant, it was *necessary* for the prosecution to present evidence at the preliminary hearing to establish probable cause to believe that he had committed the crimes charged. Conn. Const., art. I, § 8, as amended [by articles seventeen and twenty-nine of the amendments];[17] General Statutes [Rev. to 1991] § 54-46a."[18] (Emphasis in original; footnote altered.) *State* v. *Tatum*, supra, 728–29. This court further stated that "[t]he fact that the prosecution might have taken extraordinary steps to lessen the suggestiveness of the confrontation [at the probable cause hearing] by using some other identification procedure does not render the routine procedure that was used unnecessary or impermissible. The defendant had no constitutional right to a lineup; *State* v. *Vaughn*, 199 Conn. 557, 562, 508 A.2d 430, cert. denied, 479 U.S. 989, 107 S. Ct. 583, 93 L. Ed. 2d 585 (1986); nor did the state have a constitutional duty to conduct one. *State* v. *Vass*, 191 Conn. 604, 611, 469 A.2d 767 (1983)." *State* v. *Tatum*, supra, 729. Finally, the court stated that, "[a]lthough the probable cause hearing held in this case was a one-to-one pretrial confrontation, it was unlike a showup or single photo[graphic] display in that it occurred in a courtroom. The initial identification made at the probable cause hearing, therefore, resembled an initial identification made at trial. While there is little doubt that the trial setting is suggestive, for the same reasons that a probable cause hearing is suggestive, '[t]he manner in which in-court identifications are conducted is not of constitutional magnitude but rests within the sound discretion of the trial court.' *State* v. *Smith*, supra, [200 Conn.] 470." (Footnote omitted.) *State* v. *Tatum*, supra, 730–31.

We conclude that the holding in *Tatum* that it was "necessary" for the state to present a first time in-court identification of the defendant at the probable cause hearing must be overruled. We simply can perceive no reason why the state cannot attempt to obtain an identification using a lineup or photographic array before asking an eyewitness to identify the defendant in court. Although the state is not constitutionally required to do so, it would be absurd to conclude that the state can simply decline to conduct a nonsuggestive procedure and then claim that its own conduct rendered a first time in-court identification *necessary*, thereby curing it of any constitutional infirmity. See *United States* v. *Archibald*, supra, 734 F.2d 941 ("[w]e may agree with the [trial] court that there was no obligation to stage a lineup, but there was . . . an obligation to ensure that the in-court procedure . . . did not simply amount . . . to a show-up" [internal quotation marks omitted]); see also *United States* v. *Hill*, supra, 967 F.2d 231 (same); *United States* v. *Hill*, supra, 232 (although government is not required to conduct lineup, it "is prohibited under the [d]ue [p]rocess [c]lause from intro-

ducing the fruits of an impermissibly suggestive and inherently unreliable identification as evidence against the accused"). To the extent that the state claims that first time in-court identifications are necessary in cases where the eyewitness had a fair opportunity to identify the defendant before trial but was unable to do so because, otherwise, the state will not be able to present an eyewitness identification to the jury, to state this claim is to refute it. The state is not entitled to conduct an unfair procedure merely because a fair procedure failed to produce the desired result. Moreover, if the state declines to conduct a nonsuggestive identification procedure before the in-court confrontation, or if it attempts to do so but the eyewitness is unable to identify the defendant, the state is not barred from presenting *any* evidence regarding the defendant's identity and guilt. The state still can question the eyewitness about his observations of the perpetrator at the time of the crime, including his observations of the perpetrator's height, weight, sex, race, age and any other characteristics that the eyewitness was able to observe,[19] and present any other evidence that is relevant.

We also are not persuaded by the state's argument that first time in-court identifications are necessary because there is no feasible alternative. Specifically, the state contends that it would be entirely impractical to assemble a group of individuals who closely resemble the defendant and arrange for them to appear in court, that it would be dangerous to allow a defendant to sit among the spectators in court, and that there is no source of funds to pay individuals to participate in lineups. Although numerous courts have held that it is within the trial court's discretion to order a nonsuggestive in-court identification,[20] we are compelled to conclude that such a procedure is no longer viable in this state since the legislature's enactment of General Statutes § 54-1p, which governs the procedures for live lineups. Although that statute applies to identification procedures conducted by police, and the defendant makes no claim that it applies to in-court lineups, we believe that it would be inconsistent with the will of the legislature to allow a first time in-court identification that does not comport with the statutory procedures. We further conclude that it would be simply impracticable in a courtroom setting to present the lineup participants to the witness sequentially; see General Statutes § 54-1p (c) (1); and to give extensive instructions to the witness. See General Statutes § 54-1p (c) (3) (A) through (G). Nevertheless, we reject the state's claim that a traditional in-court identification is the only feasible option. Specifically, the state has not provided any convincing arguments as to why it would not be feasible to arrange for a nonsuggestive *out-of-court* lineup or photographic array, as is done routinely in cases where identity is at issue.[21] See *United States* v. *Wade*, supra, 388 U.S. 230 ("[l]ineups are prevalent

in rape and robbery prosecutions"). Indeed, the state could conduct either of these procedures at any point up to the time of the witness' testimony.

The state also claims that in-court identifications do not implicate the same concerns as unduly suggestive pretrial identification procedures because, when the identification is in court, jurors are present to observe the witness making the initial identification.[22] See *United States* v. *Domina*, 784 F.2d 1361, 1368 (9th Cir. 1986) (when initial identification is in court "[t]he jury can observe the witness during the identification process and is able to evaluate the reliability of the . . . identification"), cert. denied, 479 U.S. 1038, 107 S. Ct. 893, 93 L. Ed. 2d 845 (1987); *State* v. *Hickman*, 355 Or. 715, 735, 330 P.3d 551 (2014) (when identification is made for first time in court, jury can observe "variables such as indications of witness certainty or hesitation during the identification process, including facial expression, voice inflection and body language"). These courts fail to recognize, however, that the very reason that first time in-court identifications are so problematic is that, when the state places the witness under the glare of scrutiny in the courtroom and informs the witness of the identity of the person who has been charged with committing the crime, it is far less likely that the witness will be hesitant or uncertain when asked if that person is the perpetrator. Moreover, cross-examination is unlikely to expose any witness uncertainty or weakness in the testimony "because cross-examination is far better at exposing lies than at countering sincere but mistaken beliefs." *State* v. *Guilbert*, supra, 306 Conn. 243; see also *Commonwealth* v. *Collins*, 470 Mass. 255, 264, 21 N.E.3d 528 (2014) ("cross-examination cannot always be expected to reveal an inaccurate in-court identification where most jurors are unaware of the weak correlation between confidence and accuracy and of witness susceptibility to manipulation by suggestive procedures or confirming feedback" [internal quotation marks omitted]). In any event, even if a first time in-court identification is less likely to lead to error than an identification resulting from an out-of-court suggestive procedure, first time in-court identifications still create a greater risk of error than nonsuggestive procedures. See *Commonwealth* v. *Crayton*, supra, 470 Mass. 239–40 ("even if we were persuaded that there were evaluative benefits arising from the jury's ability to see the identification procedure, it would not justify admission of an inherently suggestive identification").

We next address the state's claim that there is no need for the trial court to prescreen in-court identifications because they "were a routine and expected part of trials at common law" and, up to the end of the nineteenth century, "were the principal means of identifying the perpetrator . . . because pretrial police investigations and identification procedures are late developments . . . ."[23] Again, we are not persuaded. First, it is beyond

dispute that the fact that a criminal procedure has roots in tradition does not necessarily mean that it is constitutional. See, e.g., *United States* v. *Wade*, supra, 388 U.S. 236–37 (holding for first time that pretrial lineup is critical stage of prosecution at which defendant has right to aid of counsel under sixth amendment);[24] see also *Stovall* v. *Denno*, 388 U.S. 293, 299–300, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967) (prior to court's decision in *Wade*, "[t]he overwhelming majority of American courts [had] always treated the evidence question [arising from the absence of defense counsel during a pretrial lineup] not as one of admissibility but as one of credibility for the jury"); cf. *United States* v. *Archibald*, supra, 734 F.2d 942–43 ("[t]he in-court identification procedure utilized here was so clearly suggestive as to be impermissible, *however traditional it may be*" [emphasis added]). Second, it would appear that the reason that eyewitness identifications played a predominant role in early English and American history is that a large proportion of criminals who were brought into court had been caught in the act by private parties, not because first time in-court eyewitness testimony was deemed to be particularly reliable. See J. Langbein, "The Criminal Trial before the Lawyers," 45 U. Chi. L. Rev. 263, 281 n.56 (1978) ("By today's standards a striking proportion of the Old Bailey [court of regular jurisdiction for serious crime in London in the sixteenth and seventeenth centuries] cases involved defendants caught in the act or taken with stolen goods. We can understand why identification evidence would predominate in an age before professional policing and well before the development of scientific techniques for generating and evaluating many of the types of circumstantial evidence now familiar to us [such as fingerprints]."). Third, first time in-court identifications became the norm at a time when travel was by foot or by horse, communications were by post, and official investigative resources were very limited. Consequently, it presumably would have been very burdensome both for the government and for eyewitnesses to arrange for a pretrial identification of the defendant. Because the difficulty of conducting a nonsuggestive identification procedure before trial is greatly reduced by the availability of instantaneous electronic communications, ready transportation and photography, the state's interest in continuing the tradition of first time in-court identifications is similarly reduced. See *In re Tremaine C.*, 117 Conn. App. 521, 530, 980 A.2d 317 (due process analysis generally "requires balancing the government's interest in existing procedures against the risk of erroneous deprivation of a private interest inherent in those procedures" [internal quotation marks omitted]), cert. denied, 294 Conn. 920, 984 A.2d 69 (2009).

The state also disputes that mistaken eyewitness identifications are a significant source of erroneous convictions. As we have indicated, this court recently

concluded otherwise. *State* v. *Guilbert*, supra, 306 Conn. 249–50 ("mistaken eyewitness identification testimony is by far the leading cause of wrongful convictions"). In addition, the legislature's enactment of § 54-1p, governing procedures for photographic arrays and live lineups, demonstrates that the legislature has concerns that suggestive procedures are a significant source of error. Even if the state were correct, however, that the emerging social science casts doubt on the earlier cases and studies that supported our statement in *Guilbert*, it is black letter law that an unnecessarily suggestive out-of-court identification triggers due process protections, and that will presumably continue to be the case until the courts are convinced that eyewitness identifications are so inherently reliable that suggestive procedures can have no significant effect on them.[25] We certainly are not prepared to make that determination in the present case and, as we have explained, if unnecessarily suggestive pretrial identification procedures trigger due process protections, we can perceive no reason why the same should not be true of unnecessarily suggestive in-court identifications.

Finally, the state raises two claims that require little analysis. With respect to the state's claim that in-court identifications do not require prescreening because the sixth amendment's confrontation clause "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact"; (internal quotation marks omitted) *State* v. *Arroyo*, 284 Conn. 597, 622, 935 A.2d 975 (2007); it does not follow from this principle that the state has a right to conduct an unnecessarily suggestive identification during the guaranteed confrontation. The state further claims that a defendant has no right to absent himself from court to avoid being identified.[26] Again, however, it simply does not follow from the fact that the defendant cannot invoke his fifth amendment right against self-incrimination as a shield against a nonsuggestive in-court or out-of-court identification that the state has the right to conduct an unnecessarily suggestive in-court identification procedure. See E. Mandery, supra, 60 Alb. L. Rev. 414 (noting that courts have confused "the privilege against self-incrimination issue presented by in-court identifications and the due process question" and concluding that, "[w]hile a defendant's presence can be compelled for purposes of identification, it is a separate issue whether a defendant can be compelled to submit to a suggestive identification" [footnote omitted]).

## III

## PROCEDURES FOR PRESCREENING FIRST TIME IN-COURT IDENTIFICATIONS

Having concluded that first time in-court identifications must be prescreened for admissibility by the trial court, we now set forth the specific procedures that

the parties and the trial court must follow.[27] Preliminarily, we take this opportunity to emphasize that, in cases in which the identity of the perpetrator is at issue and there are eyewitnesses to the crime, the best practice is to conduct a nonsuggestive identification procedure as soon after the crime as is possible. See *United States ex rel. Stovall* v. *Denno*, 355 F.2d 731, 738 (2d Cir. 1966) ("interests of the accused and society alike demand that the opportunity to identify be afforded at the earliest possible moment when the likelihood of an accurate identification is greatest"), aff'd, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967). It is our hope and expectation that this decision will provide an incentive for the state to conduct an out-of-court identification procedure before seeking an in-court identification, thereby obviating the need to resort to the procedures that we delineate herein.

In cases in which there has been no pretrial identification, however, and the state intends to present a first time in-court identification, the state must first request permission to do so from the trial court. See *Commonwealth* v. *Crayton*, supra, 470 Mass. 243 ("[a]lthough we generally place the burden on the defendant to move to suppress an identification, that makes little sense where there is no out-of-court identification of the defendant by a witness and only the prosecutor knows whether he or she intends to elicit an in-court identification from the witness"). The trial court may grant such permission only if it determines that there is no factual dispute as to the identity of the perpetrator, or the ability of the particular eyewitness to identify the defendant is not at issue.[28] Id., 241 (holding under supervisory powers that, "[w]here an eyewitness has not participated before trial in an identification procedure, we shall treat the in-court identification as an [impermissible] in-court showup, and shall admit it in evidence only where there is 'good reason' for its admission"); id., 242 (first time in-court identification may be allowed when eyewitness knew defendant before crime). For example, in cases in which the trial court determines that the only issue in dispute is whether the acts that the defendant admittedly performed constituted a crime, the court should permit a first time in-court identification. In cases in which the defendant concedes that identity or the ability of a particular witness to identify the defendant as the perpetrator is not in dispute, the state may satisfy the prescreening requirement by giving written or oral notice to that effect on the record.

If the trial court determines that the state will not be allowed to conduct a first time identification in court, the state may request permission to conduct a nonsuggestive identification procedure, namely, at the state's option, an out-of-court lineup or photographic array, and the trial court ordinarily should grant the state's request.[29] If the witness previously has been unable to

identify the defendant in a nonsuggestive identification procedure, however, the court should not allow a second nonsuggestive identification procedure unless the state can provide a good reason why a second bite at the apple is warranted.[30] If the eyewitness is able to identify the defendant in a nonsuggestive out-of-court procedure, the state may then ask the eyewitness to identify the defendant in court.[31]

If the trial court denies a request for a nonsuggestive procedure, the state declines to conduct one, or the eyewitness is unable to identify the defendant in such a procedure, a one-on-one in-court identification should not be allowed. The prosecutor may still examine the witness, however, about his or her observations of the perpetrator at the time of the crime, but the prosecutor should avoid asking the witness if the defendant resembles the perpetrator. See *United States* v. *Greene*, supra, 704 F.3d 304 ("if there is a line between resemblance and identification testimony it is admittedly thin" [internal quotation marks omitted]).

The state raises a number of objections to these procedures. First, the state contends that it is unclear what level of certainty at a prior nonsuggestive identification procedure would eliminate the need for prescreening of an in-court identification. We recognize that this question may require the exercise of judgment. We conclude however, that, as a general rule, if the state has conducted a nonsuggestive out-of-court identification procedure and the witness has identified the defendant, even with some uncertainty, the in-court identification need not be prescreened for admissibility and the witness' level of uncertainty at the initial procedure should go to the weight of the evidence.[32] If the level of certainty was so low that it amounted to a failure to identify the defendant, the in-court identification should be prescreened and ordinarily disallowed.

Second, the state contends that it is unclear what the consequence would be if a witness who is going to identify the defendant in court during trial had learned that the defendant had been charged with the crime by attending pretrial proceedings and observing the defendant. If the state was not responsible for the pretrial confrontation, this situation is analogous to any other situation in which a witness has learned the identity of the person who has been charged with the crime under suggestive circumstances that are not the result of state action. Such circumstances go to the weight of the identification testimony, not its admissibility. See *Perry* v. *New Hampshire*, supra, 132 S. Ct. 728. If the state was responsible for the suggestive pretrial confrontation, however, it must be treated in the same manner as a suggestive identification procedure, and the trial court must determine under the totality of the circumstances whether the witness would have been able to identify the defendant in court even without the

prior suggestive confrontation. Cf. *State* v. *Ledbetter*, supra, 275 Conn. 553. If the answer to that question is yes, the court should allow the in-court identification, subject to cross-examination and argument. If the answer is no, an in-court identification should be precluded, just as an in-court identification that was irreparably tainted by an unnecessarily suggestive identification procedure would be.

Third, the state contends that, if the trial court precludes the state from obtaining a first time in-court identification, fairness requires that the trial court give a jury instruction explaining that the identification was not permitted. We conclude that, if the state requests such an instruction, the trial court may provide the jury with an accurate statement of the law, specifically, that an in-court identification was not permitted because inherently suggestive first time in-court identifications create a significant risk of misidentification and because either the state declined to pursue other, less suggestive means of obtaining the identification or the eyewitness was unable to provide one. The state is not entitled to an instruction that would suggest to the jury that the eyewitness could have made a reliable identification of the defendant in court if the state had been permitted to request the witness to do so.

Finally, the state contends that, if we preclude first time in-court identifications pursuant to our supervisory powers, the new rule must be prospective only. We have concluded, however, that first time in-court identifications implicate constitutional due process rights. It is well established that "new [constitutional] rules of criminal procedure must be applied in future trials and in cases pending on direct review . . . ." *Danforth* v. *Minnesota*, 552 U.S. 264, 266, 128 S. Ct. 1029, 169 L. Ed. 2d 859 (2008); see also *Griffith* v. *Kentucky*, 479 U.S. 314, 322–23, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987) ("Unlike a legislature, we do not promulgate new rules of constitutional criminal procedure on a broad basis. Rather, the nature of judicial review requires that we adjudicate specific cases, and each case usually becomes the vehicle for announcement of a new rule. But after we have decided a new rule in the case selected, the integrity of judicial review requires that we apply that rule to all similar cases pending on direct review."); *Griffith* v. *Kentucky*, supra, 328 ("a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a clear break with the past" [internal quotation marks omitted]).[33] Accordingly, the new rule that we adopt today applies to the parties to the present case and to all pending cases.[34] It is important to point out, however, that, in pending *appeals* involving this issue, the suggestive in-court identification has already occurred. Accordingly, if the reviewing court concludes

that the admission of the identification was harmful, the only remedy that can be provided is a remand to the trial court for the purpose of evaluating the reliability and the admissibility of the in-court identification under the totality of the circumstances.[35] Cf. *United States* v. *Wade*, supra, 388 U.S. 242 (when in-court identification is preceded by out-of-court identification without aid of counsel, proper procedure on review is to vacate conviction and to remand to trial court for hearing to determine whether in-court identification was independently reliable); see also *State* v. *Ledbetter*, supra, 275 Conn. 553 ("corruptive effect of suggestive procedure [regarding eyewitness identification] is weighed against certain factors"). If the trial court concludes that the identification was sufficiently reliable, the trial court may reinstate the conviction, and no new trial would be required.

## IV

## APPLICATION OF NEW PROCEDURES TO PRESENT CASE

We now apply the foregoing principles to the present case. Because Weibel's in-court identification of the defendant was preceded by an unsuccessful attempt to identify the defendant in a photographic array, it was a first time in-court identification. In addition, the identity of the person who assaulted Weibel was in dispute and the defendant was not known to Weibel before the assault. Accordingly, we conclude that the identification testimony should have been prescreened and the state should have been required either to conduct a nonsuggestive identification procedure—in the event that the trial court concluded that the state was entitled to such a procedure even though Weibel had failed to identify the defendant in the photographic array—or to refrain from seeking an in-court identification. We further conclude that the failure to follow these procedures potentially violated the defendant's due process rights.[36]

## V

## HARMLESS ERROR ANALYSIS

Even if we were to assume that Weibel's in-court identification of the defendant was improperly admitted, however, we conclude that any due process violation was harmless beyond a reasonable doubt. See *State* v. *Artis*, 314 Conn. 131, 154, 101 A.3d 915 (2014) ("because of the constitutional magnitude of the error, the burden falls on the state to prove that the admission of the tainted identification was harmless beyond a reasonable doubt"). A constitutional error is harmless when it is "clear beyond a reasonable doubt that the jury would have returned a guilty verdict without the impermissible [evidence] . . . ." (Internal quotation marks omitted.) *State* v. *Montgomery*, 254 Conn. 694, 718, 759 A.2d 995 (2000). "That determination must be

made in light of the entire record [including the strength of the state's case without the evidence admitted in error]." (Internal quotation marks omitted.) Id.

The following facts and procedural history, some of which we have already discussed, are relevant to our analysis. Lyles testified at trial that, before the robbery at issue in the present case, he had engaged in similar robberies with the help of a friend whom he knew only as "Black." On the evening of January 9, 2010, at about 8 p.m., he was at the apartment of a friend, Stephanie Perez, at 455 Trumbull Avenue in Bridgeport. Reyes was also at the apartment. At approximately 9 p.m., the defendant and the defendant's sister arrived. Lyles had known the defendant his entire life because their mothers were close friends. At some point, Lyles left the apartment and the defendant and Reyes followed him. Lyles told the men that he was planning a robbery and they indicated that they wanted to participate. Lyles was armed with a .40 caliber Smith and Wesson handgun, the defendant carried a .38 caliber revolver, and Reyes carried a paintball gun that looked like an assault rifle. Lyles had supplied the weapons. After leaving the apartment, the three men proceeded to Terrace Circle in Bridgeport, where the events previously described in this opinion occurred. As Lyles and Reyes were leaving the scene after the robbery, the defendant was holding his gun to Weibel's head. Lyles then heard two gunshots. He and Reyes returned to the parking lot behind the apartment building at 455 Trumbull Avenue and got into a Cadillac owned by Perez. Approximately two minutes later, the defendant joined them. They then drove to the residence of Lyles' friend "L" on Louis Street in the south end of Bridgeport. At that point, Lyles asked the defendant about the shooting and the defendant stated that he had shot Weibel in the head and leg "because we didn't get any money." Both Weibel and Shaw were able to identify Lyles and their testimony at trial corroborated Lyles' testimony concerning the events at Terrace Circle, specifically, that Lyles was not the shooter.

Lyles further testified at trial that he was currently incarcerated and that, as a result of the incident on the night of January 9, 2010, he had been charged with accessory to assault in the first degree, robbery in the first degree, larceny in the fifth degree, violation of probation, attempted murder and conspiracy to commit robbery. He had negotiated a tentative plea agreement with the state, which had not yet been signed, pursuant to which he would be sentenced to fifteen years imprisonment, suspended sometime between three and seven years, with five years probation. He had also signed an agreement to cooperate with the state in its investigation of the present case. Pursuant to that agreement, if Lyles testified untruthfully at trial, he would serve the maximum sentence.

On cross-examination, defense counsel asked Lyles how he could be sentenced to the maximum sentence of approximately forty years imprisonment if he testified untruthfully when he had not yet pleaded guilty to the charges. Lyles acknowledged that the maximum sentence was not reflected in his agreement to testify. He also acknowledged that the police were investigating the three robberies that he had committed with "Black" and that he would not be charged in any of those cases. Lyles denied that "Black" was his cousin, Rasheem Davis, who was the only other person who had access to the e-mail account that Lyles had used to lure his robbery victims. Lyles admitted that he had been arrested in December, 2009, after he helped Perez steal items from a department store where he was employed, and that he had not been charged with another theft from that store. He further admitted that he had lied repeatedly to the police during their investigation of the present case.[37] On redirect examination, Lyles testified that he had lied to the police before he entered into the agreement to cooperate with the state requiring him to speak truthfully.

The defendant presented alibi evidence in the form of testimony by his mother and his aunt that he had been with his family at a sports bar in Bridgeport watching a playoff game between the Philadelphia Eagles and the Dallas Cowboys on the evening of January 9, 2010. The defendant's mother testified that kickoff was at approximately 8:30 or 9 p.m., but she did not testify as to whether the defendant was in the bar at that time.[38] The defendant's aunt testified that the defendant arrived at the bar before kickoff, but she could not remember the precise time.[39] The defendant left the bar with his mother when the game ended at approximately 11:30 p.m. The defendant's mother remembered the evening very clearly because she was an ardent Eagles fan and her husband was an ardent Cowboys fan. When the Cowboys defeated the Eagles in that football game, the defendant's mother and father had an intense argument. The defendant's aunt specifically recalled that the defendant left the bar with his mother because he stated that he was going to have to act as a referee when they got home.

As we have indicated previously, Weibel acknowledged at trial that he had been unable to identify the defendant from a photographic array approximately one year after the shooting. During closing argument, the prosecutor argued that Weibel's in-court identification of the defendant was nevertheless credible because "[l]ooking at photographs is very different from looking at people. We look different from photographs." The prosecutor also stated, "What kind of an impression did those moments of being hit with the gun and being shot make on [Weibel]? What burned into his mind—what image burned into his mind at that point, but the

face of the person who shot him." Defense counsel argued that, to the contrary, the in-court identification was unreliable because Weibel had been unable to identify the defendant in the photographic array, the crime scene was dark, and the identification was not corroborated by other evidence. Defense counsel further contended that, because the defendant was the only black male sitting in the courtroom other than the uniformed marshal, and because the defendant was sitting at the table with defense counsel, the in-court identification "[was] practically a neon light pointed to the [defendant] . . . ." The trial court gave a lengthy instruction on eyewitness identification testimony in which it stated that certainty did not correlate to accuracy and that, in determining what weight to give to Weibel's identification, the jury could consider the suggestiveness of the identification procedure, the fact that the eyewitness had failed to identify the defendant in a photographic array, and the fact that a lineup procedure is generally more reliable than a one-on-one showup.[40]

We conclude on the basis of this record that it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict even without Weibel's in-court identification of the defendant. First, although the defendant presented evidence that Lyles had lied to the police in the past, there is no evidence that Lyles made any material misrepresentations or misstatements during his testimony at trial. Second, although Lyles clearly had a motive to cooperate with the state, the record does not reveal any motive for Lyles to have falsely identified the defendant as Weibel's assailant.[41] Both Weibel and Shaw testified unequivocally that Lyles was not the person who had shot Weibel, and Lyles did not deny his involvement in the crime. Thus, Lyles clearly was not attempting to shift blame from himself to the defendant. In addition, the undisputed evidence shows that Lyles had known the defendant his entire life and had been on friendly terms with him. Thus, there is no evidence that Lyles had a motive to harm the defendant. Third, Lyles' testimony regarding the events on the night in question was corroborated in all material respects by Weibel and Shaw. Fourth, neither of the alibi witnesses testified unequivocally that the defendant had been in the sports bar with his family at 9:30 p.m. on January 9, 2010, when the crime occurred. See footnotes 38 and 39 of this opinion. Moreover, to the extent that the testimony of the defendant's mother and aunt would support that conclusion, both witnesses had a clear motive to attempt to convince the jury that the defendant was in the bar at that time. Finally, the weaknesses in Weibel's identification testimony were highlighted both by the defendant during closing argument and by the trial court in its jury instructions. Accordingly, we conclude that the improper admission of Weibel's first time in-court iden-

tification was harmless. We therefore affirm the judgment of the Appellate Court upholding the defendant's conviction on this alternative ground.

The judgment of the Appellate Court is affirmed.

In this opinion PALMER, EVELEIGH and McDONALD, Js., concurred.

[1] This court held in *State* v. *Smith*, supra, 200 Conn. 469, that "an in-court testimonial identification need be excluded, as violative of due process, only when it is tainted by an out-of-court identification procedure which is unnecessarily suggestive and conducive to irreparable misidentification."

[2] For purposes of this opinion, we refer to an identification procedure that is not unnecessarily suggestive as a nonsuggestive procedure.

[3] Hereinafter, we refer to in-court identifications in cases in which the witness has not successfully identified the defendant in a prior out-of-court identification procedure as first time in-court identifications.

[4] The Appellate Court concluded that the defendant had abandoned his claim under the state constitution. *State* v. *Dickson*, supra, 150 Conn. App. 642 n.5.

[5] Because we agree with the defendant's alternative claim that *Smith* must be overruled to the extent that it applies to cases in which the state has conducted a first time in-court identification, we need not address this claim.

[6] In his concurring opinion, Justice Robinson, quoting *Moore* v. *McNamara*, 201 Conn. 16, 20, 513 A.2d 660 (1986), contends that "[t]his court has a basic judicial duty to avoid deciding a constitutional issue if a nonconstitutional ground exists that will dispose of the case." (Internal quotation marks omitted.) In most of the cases that he cites in support of this principle, however, the court had been asked to invalidate a legislative enactment as unconstitutional when there were nonconstitutional grounds on which the case could be decided. In such circumstances, respect for a coordinate branch of government and constitutional separation of powers principles mandate that we avoid reaching the constitutional question. See *Moore* v. *McNamara*, supra, 21 ("[a]ppropriate deference to a coordinate branch of government exercising its essential functions demands that we refrain from deciding constitutional challenges to its enactments until the need to do so is plainly evident" [internal quotation marks omitted]).

These principles have no application in cases in which the state action is claimed to be unconstitutional, but may be found harmless beyond a reasonable doubt. Rather, the principle underlying the avoidance of constitutional questions in such cases is judicial economy and convenience. See *United States* v. *Hasting*, 461 U.S. 499, 509, 103 S. Ct. 1974, 76 L. Ed. 2d 96 (1983) (purpose of avoiding constitutional questions when unconstitutional act was harmless "is to conserve judicial resources by enabling appellate courts to cleanse the judicial process of prejudicial error without becoming mired in harmless error" [internal quotation marks omitted]); *State* v. *Golding*, 213 Conn. 233, 242, 567 A.2d 823 (1989) (same); see also *State* v. *Jordan*, 314 Conn. 89, 101, 101 A.3d 179 (2014) ("we conclude that the present case *does not require us* to weigh in on this debate" because, even assuming that action was unconstitutional, it was harmless [emphasis added]). Because this principle is for the benefit of the reviewing court, the court is free to disregard it when appropriate. Indeed, this court and the Appellate Court have not hesitated to find a constitutional violation when the violation was harmless. See, e.g., *State* v. *Hampton*, 293 Conn. 435, 463, 988 A.2d 167 (2009); *State* v. *Montgomery*, 254 Conn. 694, 716, 759 A.2d 995 (2000); *State* v. *Daugaard*, 231 Conn. 195, 213, 647 A.2d 342 (1994), cert. denied, 513 U.S. 1099, 115 S. Ct. 770, 130 L. Ed. 2d 666 (1995); *State* v. *Peloso*, 109 Conn. App. 477, 495, 952 A.2d 825 (2008); *State* v. *Coleman*, 14 Conn. App. 657, 675–76, 544 A.2d 194, cert. denied, 208 Conn. 815, 546 A.2d 283 (1988).

In the present case, because the constitutional issue raised by the defendant is of such great importance, and because first time in-court identifications are occurring on a regular basis, we do not have the luxury of waiting for a case in which this practice actually deprived the defendant of his constitutional right to a fair trial. Rather, the pressing need for guidance in the trial court through a constitutional rule outweighs considerations of judicial economy or convenience. Accordingly, we conclude that we must address the issue.

Finally, contrary to Justice Robinson's contention, we have not defended our decision to address the constitutional issue raised by the defendant by relying on the United States Supreme Court's certiorari process. By pointing out that that court has the authority to overrule our decision, either in an appeal from our decision in the present case or in an appeal from the

decision of another court on the same issue, we are simply responding to Justice Zarella's contention that we have somehow exceeded our authority to interpret the federal constitution by adopting a prophylactic constitutional rule. See footnote 11 of this opinion. To the contrary, our conclusion is entirely consistent with the notion that state courts provide valuable incubators for federal constitutional issues. S. Woodward, "The Remedy for A '*Nollan/Dolan* Unconstitutional Conditions Violation,' " 38 Vt. L. Rev. 701, 713 n.75 (2014) ("[s]tate courts have been the incubators for what later becomes incorporated into the [f]ederal [c]onstitution").

[7] Hereinafter, we refer to these factors as the *Biggers* factors.

[8] We address the state's claim that the United States Supreme Court's decision in *Perry* v. *New Hampshire*, supra, 132 S. Ct. 716, addressed this question later in this opinion.

[9] See *Gilbert* v. *California*, 388 U.S. 263, 272 n.3, 87 S. Ct. 1951, 18 L. Ed. 2d 1178 (1967) (out-of-court "identification has greater probative value than an identification made in the courtroom after the suggestions of others and the circumstances of the trial may have intervened to create a fancied recognition in the witness' mind" [internal quotation marks omitted]); *United States* v. *Greene*, 704 F.3d 298, 306 (4th Cir.) (" '[P]ressured to help solve a heinous crime, often conscious of a duty to do so, and eager to be of assistance, a potential witness may be readily receptive to subtle, even circumstantial, insinuation that the person viewed is the culprit. Unless such a witness is far more introspective than most, and something of a natural-born psychologist, he is usually totally unaware of all of the influences that result in his [saying], "That is the man." ' "), cert. denied,     U.S.    , 134 S. Ct. 419, 187 L. Ed. 2d 279 (2013); *United States* v. *Rogers*, 126 F.3d 655, 658 (5th Cir. 1997) ("it is obviously suggestive to ask a witness to identify a perpetrator in the courtroom when it is clear who is the defendant"); *United States* v. *Archibald*, 734 F.2d 938, 941 ("[a]ny witness, especially one who has watched trials on television, can determine which of the individuals in the courtroom is the defendant"), modified, 756 F.2d 223 (2d Cir. 1984); *State* v. *Smith*, supra, 200 Conn. 468–69 ("[a]ny one-on-one in-court identification of an accused conveys the message that the state has arrested and placed on trial a person it believes has committed the crime"); *State* v. *Frost*, 105 Conn. 326, 341, 135 A. 446 (1926) ("[a]n identification of an accused made publicly for the first time by a witness in court . . . may be open to question, but if it be shown that the witness identified the accused previously and the first time after his arrest or incarceration and under circumstances which removed the suspicion of unfairness or unreliability, the prior identification, together with the circumstances surrounding its making, will be of utmost aid in determining the trustworthiness of the identification made in the court room"); *State* v. *Frost*, supra, 341 ("Ordinarily, when a witness is asked to identify the assailant, or thief, or other person who is the subject of his testimony, the witness' act of pointing out then and there the accused [or other person] is of little testimonial force. After all that has intervened, it would seldom happen that the witness would not have come to believe in the person's identity." [Emphasis omitted; internal quotation marks omitted.]); *Middleton* v. *United States*, 401 A.2d 109, 132 (D.C. App. 1979) (in-court identification is "by its very nature . . . extremely suggestive"); *Commonwealth* v. *Wheeler*, 3 Mass. App. 387, 390, 331 N.E.2d 815 (1975) ("any in-court identification confrontation . . . carries with it the stigma of the inevitable suggestion that the state thinks the defendant has committed the crime" [internal quotation marks omitted]); E. Mandery, "Due Process Considerations of In-Court Identifications," 60 Alb. L. Rev. 389, 416 (1996) ("[t]he pressure of being asked to make an identification in the formal courtroom setting and the lack of anonymity, create conditions under which a witness is most likely to conform his or her recollection to expectations, either by identifying the particular person whom he or she knows the authorities desire identified, or by acting in conformity with the behavior of others they may have seen on television or in movies or read of in books").

We recognize that a number of courts have concluded otherwise. See E. Mandery, supra, 60 Alb. L. Rev. 405 n.122 (collecting cases). In our view, however, to conclude that telling an eyewitness who is on the stand and who previously had not had an opportunity to identify the defendant, or who had such an opportunity, but was unable to do so, that the state believes that this is the person who committed the crime is not suggestive simply defies common sense.

[10] We also note that, in 2011, the legislature enacted General Statutes § 54-1p; see Public Acts 2011, No. 11-252, § 1; which governs the procedures that the police must use when conducting photographic arrays and live lineups. This statute demonstrates a clear legislative concern that suggestive identification procedures are a significant cause of erroneous convictions and

should be eliminated to the extent possible.

[11] Thus, we conclude for the first time today that *any* first time in-court identification by a witness who would have been unable to reliably identify the defendant in a nonsuggestive out-of-court procedure constitutes a procedural due process violation. This is contrary to the holding of *Smith* that only in-court identifications that are tainted by an unduly suggestive out-of-court identification violate due process principles. Although we recognize that, when the witness could have identified the defendant in a nonsuggestive procedure, a first time in-court identification does not constitute an *actual* violation of due process principles, this court has an obligation to adopt procedures that will eliminate the *risk* that the defendant will be deprived of a constitutionally protected right by being identified in court by a witness who could not have identified the defendant in a fair proceeding. Indeed, it is well established that courts have the duty not only to craft remedies for actual constitutional violations, but also to craft prophylactic constitutional rules to *prevent* the significant risk of a constitutional violation. See *Montejo* v. *Louisiana*, 556 U.S. 778, 793, 129 S. Ct. 2079, 173 L. Ed. 2d 955 (2009) (recognizing authority of court to create prophylactic constitutional rule when benefits of rule outweigh costs); *Oregon* v. *Elstad*, 470 U.S. 298, 305, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985) (rule set forth in *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 [1966], is prophylactic and was intended to provide "practical reinforcement for the [f]ifth [a]mendment right" [internal quotation marks omitted]); *State* v. *Jenkins*, 298 Conn. 209, 280, 3 A.3d 806 (2010) (considering defendant's request for prophylactic constitutional rule); see also B. Landsberg, "Safeguarding Constitutional Rights: The Uses and Limits of Prophylactic Rules," 66 Tenn. L. Rev. 925, 950 (1999) (prophylactic constitutional rules "are predicated on a judicial judgment that the risk of a constitutional violation is sufficiently great that simple case-by-case enforcement of the core right is insufficient to secure that right"); S. Klein, "Identifying and (Re)formulating Prophylactic Rules, Safe Harbors, and Incidental Rights in Constitutional Criminal Procedure," 99 Mich. L. Rev. 1030, 1032–33 (2001) ("A 'constitutional prophylactic rule' is a judicially-created doctrinal rule or legal requirement determined by the [c]ourt as appropriate for deciding whether an explicit or 'true' federal constitutional rule is applicable. It may be triggered by less than a showing that the explicit rule was violated, but provides approximately the same result as a showing that the explicit rule was violated. It is appropriate only upon two determinations: first, that simply providing relief upon a showing that the explicit right was violated is ineffective; second, that use of this rule will be more effective and involve only acceptable costs."). In the present case, we conclude that the practice of allowing first time in-court identifications creates a significant risk of a due process violation and that the procedures that we adopt herein are more effective at preventing such violations, less costly and more in keeping with the legislative will than any other alternative.

We further note that, as the United States Supreme Court recognized in *Dickerson* v. *United States*, 530 U.S. 428, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000), the fact that a rule is designed to prophylactically prevent constitutional violations and is not itself constitutionally mandated "in the sense that nothing else will suffice to satisfy constitutional requirements"; id., 442; does not mean that the rule does not have the force of a constitutional rule. See id., 444 ("*Miranda* announced a constitutional rule that Congress may not supersede legislatively"). Thus, the adoption of prophylactic constitutional rules does not constitute an exercise of supervisory authority. See id., 437 ("[t]his case . . . turns on whether the *Miranda* [c]ourt announced a constitutional rule or merely exercised its supervisory authority"); id., 438 (*Miranda* is binding on state courts, which would not be true if rule were merely supervisory). In the present case, for example, although it is arguable that the legislature constitutionally could enact procedures that are different from the procedures that we adopt herein if the procedures were equally effective at preventing inherently unreliable first time in-court identifications, the legislature could not constitutionally enact legislation providing that first time in-court identifications are categorically admissible, because we have concluded that first time in-court identifications violate constitutional due process principles when the witness would have been unable to identify the defendant in a fair procedure. See id., 442 (federal statute overruling *Miranda* was unconstitutional because it created test for admissibility of confession that court had found constitutionally unacceptable in *Miranda*); B. Landsberg, supra, 66 Tenn. L. Rev. 950 (Prophylactic rules "are best characterized as hybrid rules. They are based on the [c]onstitution

because they are predicated on a judicial judgment that the risk of a constitutional violation is sufficiently great that simple case-by-case enforcement of the core right is insufficient to secure that right. . . . However, there may be myriad ways to reach the objective of safeguarding constitutional rights. The [c]ourt acts in a legislative fashion when it chooses a particular method. The [c]onstitution may demand imposition of a prophylactic rule, but it does not demand a *particular* one." [Emphasis in original.]).

We are not persuaded by the Justice Zarella's reliance on Justice Ginsburg's concurring opinion in *Ohio* v. *Robinette*, 519 U.S. 33, 40, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996), which, according to Justice Zarella, supports the proposition that a state court lacks the authority to craft prophylactic rules to protect rights guaranteed by the United States constitution. Justice Ginsburg wrote that the rule under review in *Robinette* "seem[ed] to be a prophylactic measure not so much extracted from the text of any constitutional provision as crafted by the Ohio Supreme Court to reduce the number of violations of textually guaranteed rights. In *Miranda* v. *Arizona*, [supra, 384 U.S. 436], this [c]ourt announced a similarly motivated rule as a minimal national requirement without suggesting that the text of the [f]ederal [c]onstitution required the precise measures the [c]ourt's opinion set forth. See id., [467] ('[T]he [c]onstitution [does not] necessarily requir[e] adherence to any particular solution' to the problems associated with custodial interrogations.); see also *Oregon* v. *Elstad*, 470 U.S. 298, 306 [105 S. Ct. 1285, 84 L. Ed. 2d 222] (1985) ('The *Miranda* exclusionary rule . . . sweeps more broadly than the [f]ifth [a]mendment itself.'). Although all parts of the United States fall within this [c]ourt's domain, the Ohio Supreme Court is not similarly situated. That court can declare prophylactic rules governing the conduct of officials in Ohio, but it cannot command the police forces of sister [s]tates." *Ohio* v. *Robinette*, supra, 43. We do not agree with Justice Zarella that this language clearly indicates that Justice Ginsburg believed that state courts lack the authority to adopt prophylactic rules to protect rights guaranteed by the federal constitution. Rather, it appears to us that Justice Ginsburg may have incorrectly assumed both that prophylactic rules, like the one adopted in *Miranda*, are adopted pursuant to a court's supervisory powers and that supervisory rules adopted by the United States Supreme Court are binding on the states. Although our decisions announcing federal constitutional rules are, for reasons of *federalism*, not binding on other state courts, it is beyond dispute that this court has the authority to announce federal constitutional rules that, in our opinion, have force in all jurisdictions; see, e.g., *Giaimo* v. *New Haven*, 257 Conn. 481, 509, 778 A.2d 33 (2001) (for purposes of invoking due process provisions of federal constitution, "an applicant for a statutory benefit . . . has a protected property interest in the benefit when, under the governing statute, the decision-making body would have no discretion to deny the application if the applicant could establish at a hearing that it met the statutory criteria"); and we have concluded in the present case that the procedures that we adopt herein are required to protect due process rights under the federal constitution. Of course, if other states disagree with our decision, they can decline to follow it and, if the United States Supreme Court disagrees, that court has the authority to overrule our decision. That would not mean, however, that we lacked the authority to adopt prophylactic rules that we believe are necessary to protect rights guaranteed by the federal constitution in the first instance.

In her concurring opinion, Justice Espinosa states that, by adopting this prophylactic rule, we have "[laid] claim to a power that is without any foundation," and she suggests that our decision is "part of an emerging pattern of judicial activism in this court." There simply is no doubt, however, that this court has the power to interpret the federal constitution and to apply its interpretation to actions of the state and its constituent parts, including prosecutors and trial courts. Indeed, Justice Espinosa and Justice Zarella make no claim to the contrary, but simply disagree with our conclusion that first time in-court identifications violate the due process provisions of the federal constitution when the witness would not have been able to identify the defendant in a nonsuggestive out-of-court procedure. In our view, having found that first time in-court identifications implicate the due process provisions of the federal constitution, it is indisputable that our power to take steps to prevent such constitutional violations is an inherent aspect of our basic constitutional function of interpreting the law, and certainly does not constitute judicial activism. See *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803) ("[i]t is emphatically the province and duty of the judicial department to say what the law is"). To the contrary, to stand back and permit prosecutors and trial courts to engage in a practice

that creates a significant risk that defendants will be deprived of their constitutional right to a fair trial would be an abdication of our constitutional duty.

[12] But see *United States* v. *Davis*, 103 F.3d 660, 670 (8th Cir. 1996) (concluding that in-court identification procedure, although suggestive, is "not so impermissibly suggestive as to lead to a likelihood of irreparable misidentification"), cert. denied, 520 U.S. 1258, 117 S. Ct. 2424, 138 L. Ed. 2d 187 (1997). In *Davis*, the United States Court of Appeals for the Eighth Circuit did not refer to its prior holding to the contrary in *United States* v. *Rundell*, supra, 858 F.2d 427.

[13] Although the witness in *Smith* was not entirely certain of her identification of the defendant in the pretrial identification procedure; see *State* v. *Smith*, supra, 200 Conn. 467; we conclude later in this opinion that uncertain identifications are admissible unless the witness was so uncertain that the identification amounted to a failure to identify the defendant.

[14] See, e.g., *United States* v. *Bush*, 749 F.2d 1227, 1232 (7th Cir. 1984) (first time in-court identification is not so inherently suggestive that, standing alone, it triggers due process protections), cert. denied, 470 U.S. 1058, 105 S. Ct. 1771, 84 L. Ed. 2d 831 (1985); *Baker* v. *Hocker*, 496 F.2d 615, 617 (9th Cir. 1974) ("[t]he danger posed by a courtroom identification is insufficient to require" due process protections); *Byrd* v. *State*, 25 A.3d 761, 767 (Del. 2011) ("we join the majority of courts in concluding that the two-step *Biggers* analysis does not apply to in-court identifications that do not come following an impermissibly suggestive pretrial identification"); *State* v. *King*, 156 N.H. 371, 376, 934 A.2d 556 (2007) ("we join the apparent majority of courts in concluding that . . . *Biggers* does not apply to in-court identifications" [internal quotation marks omitted]); *State* v. *Lewis*, 363 S.C. 37, 42, 609 S.E.2d 515 (2005) ("[w]e conclude, as the majority of courts have, that . . . *Biggers* does not apply to in-court identifications"); E. Mandery, supra, 60 Alb. L. Rev. 400 (as of 1997, majority of courts had concluded that in-court identifications ordinarily do not trigger due process protections); E. Mandery, supra, 402–404 and nn.108 through 113, and 115 (citing cases).

[15] See, e.g., *Perry* v. *New Hampshire*, supra, 132 S. Ct. 723 (referring to "suggestive circumstances not arranged by the police"); id., 723–24 (referring to "police-arranged identification procedures"); id., 724 ("[e]ven when the police use [an unfair identification] procedure . . . suppression of the resulting identification is not the inevitable consequence").

[16] Before the probable cause hearing, the eyewitness had been shown "a photographic array that included the defendant's picture, but he declined to identify anyone, explaining that he preferred to see the individuals in person." *State* v. *Tatum*, supra, 219 Conn. 724. The court in *Tatum* stated that, "[a]t the probable cause hearing, both parties referred to [a previous in person lineup] . . . from which [the eyewitness] failed to select anyone as his assailant. Since there is no other mention of such a procedure anywhere in the trial record or in any of the appellate briefs, we exclude it from our recitation of the background facts." Id., 724–25 n.7.

[17] The constitution of Connecticut, article first, § 8, as amended by articles seventeen and twenty-nine of the amendments, provides: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel; to be informed of the nature and cause of the accusation; to be confronted by the witnesses against him; to have compulsory process to obtain witnesses in his behalf; to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great; and in all prosecutions by information, to a speedy, public trial by an impartial jury. No person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process of law, nor shall excessive bail be required nor excessive fines imposed. No person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law, except in the armed forces, or in the militia when in actual service in time of war or public danger."

[18] General Statutes (Rev. to 1991) § 54-46a (a) provides: "No person charged by the state, who has not been indicted by a grand jury prior to May 26, 1983, shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause to believe that the offense charged has been committed and that the accused person has committed it. The accused person may knowingly and voluntarily waive such preliminary hearing to determine probable cause."

[19] Of course, if an eyewitness was unable to provide any of these details

before the court proceeding, asking him to provide them at the proceeding would present the same problem as a first time in-court identification. Specifically, the witness could simply describe the defendant who was facing the witness in court. Because this problem is not presented in the present case, we need not address it.

[20] See, e.g., *United States* v. *Domina*, 784 F.2d 1361, 1368–69 (9th Cir. 1986) (trial court has discretion to allow in-court lineup or other procedure to reduce suggestiveness of in-court identification), cert. denied, 479 U.S. 1038, 107 S. Ct. 893, 93 L. Ed. 2d 845 (1987); *United States* v. *Sebetich*, 776 F.2d 412, 420–21 (3d Cir. 1985) (requiring government to conduct nonsuggestive identification procedures in lieu of one-on-one in-court identification "will not be unduly burdensome, and their potential benefits would . . . outweigh any additional time or complexity at trial"), cert. denied, 484 U.S. 1017, 108 S. Ct. 725, 98 L. Ed. 2d 673 (1988); *United States* v. *Archibald*, supra, 734 F.2d 942 ("[a] fairly short delay of proceedings was all that would have been required to rearrange the seating in the courtroom and to secure the presence of some people of the defendant's approximate age and skin color").

[21] The state contends that it is unclear what type of procedure would qualify as nonsuggestive and whether the persons in the lineup or photographic array should resemble the defendant at the time of trial or at the time of the crime. The case law is replete, however, with guidance on what constitutes a suggestive identification procedure. See *United States* v. *Wade*, supra, 388 U.S. 232–33, 232 nn.18 through 23 (citing cases in which suggestive procedures are described). Moreover, § 54-1p expressly describes procedures for avoiding undue suggestiveness. If the defendant's appearance has changed since the time of the crime, the state has the option of producing a photographic array with photographs of the defendant as he appeared at the time of the crime and similar looking individuals or of conducting a lineup with individuals who look similar to the defendant at the time of the trial. If the defendant's appearance has changed so much from the time of the crime that the eyewitness would not be able to recognize the defendant in a nonsuggestive lineup, it is no solution to allow the state to conduct a suggestive in-court identification. The possibility of the defendant's appearance changing over time is one of many reasons that the state should conduct an identification procedure at the earliest possible time when identity is at issue in a case. *United States ex rel. Stovall* v. *Denno*, 355 F.2d 731, 738 (2d Cir. 1966) ("interests of the accused and society alike demand that the opportunity to identify be afforded at the earliest possible moment when the likelihood of an accurate identification is greatest"), aff'd, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967).

The state also contends in its supplemental brief that "[p]olice have largely *stopped using* live lineups because of the practical obstacles, and, even more importantly, because the criteria for nonsuggestiveness have tightened so much that live lineups can rarely satisfy them." (Emphasis in original.) Even if it is true that police have stopped using lineups because it is difficult to conduct them in a nonsuggestive manner, that, again, is no reason to allow a highly suggestive in-court identification. Indeed, if police have stopped using live lineups, it may be because they know that, under *Smith*, a suggestive lineup may result in the *exclusion* of both the out-of-court and the in-court identification, while, if there is *no* pretrial lineup, the witness can be asked to identify the defendant for the first time in the highly suggestive courtroom setting.

[22] The state also contends that in-court identifications pose no undue risk of error because they are subject to cross-examination, expert testimony, arguments and jury instructions. This does not distinguish in-court identifications from out-of-court identifications that are the result of unnecessarily suggestive procedures, however, and such identifications trigger due process protections.

[23] The state further contends in its brief that, "[t]raditionally, in-court identifications were *the* admissible identification evidence. Many courts held that evidence of out-of-court identifications [were] inadmissible because [they were] hearsay . . . [impermissible bolstering of in-court identification] or prejudicial . . . ." (Citations omitted; emphasis in original.) In order for that evidentiary rule to apply, however, there had to have been a prior out-of-court identification. In such cases, the in-court identification would not be unnecessarily suggestive.

[24] See also *Crawford* v. *Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) (holding for first time that, under sixth amendment confrontation clause, testimonial evidence is admissible only when witness

is unavailable to testify at trial and defendant had prior opportunity for cross-examination); *Ring* v. *Arizona*, 536 U.S. 584, 609, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002) (holding for first time that sixth amendment prohibits sentencing judge from finding aggravating circumstance necessary for imposition of death penalty); *Taylor* v. *Louisiana*, 419 U.S. 522, 534, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975) (holding for first time that defendant's sixth amendment right to jury drawn from fair cross section of community precludes state from systematically excluding women from jury service).

[25] Thus, contrary to Justice Zarella's suggestion, we do not rely on "evolving social science." See footnote 4 of Justice Zarella's concurring opinion. Rather, we rely on black letter law holding that suggestive identification procedures raise due process concerns.

[26] See *United States* v. *Wade*, supra, 388 U.S. 222 ("[t]he prohibition of compelling a man in a criminal court to be witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material" [internal quotation marks omitted]); *United States ex rel. Stovall* v. *Denno*, 355 F.2d 731, 737 (2d Cir. 1966) ("[t]he principle that an arrested person may be exhibited for identification to the person injured by the commission of the crime . . . is so consistent with fundamental fairness both to the accused and society that there is little point in further elaboration except to take notice that the law sanctions many methods of identification which do not invade the field of testimonial compulsion such as the use of fingerprints and photographs, including photographs of body scars" [citations omitted; internal quotation marks omitted]), aff'd, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967).

[27] After oral argument before this court, the state filed a motion for permission to file a supplemental brief in which it argued that, because the only remedies that the defendant sought in the present case were preclusion of Weibel's in-court identification or a nonsuggestive in-court identification procedure, the state was not on notice that this court would adopt alternative procedures to protect the due process rights of defendants if we overruled *State* v. *Smith*, supra, 200 Conn. 465, and concluded that first time in-court identifications implicate due process rights. Specifically, the state contended that it had "no notice of the possibility that this [c]ourt would craft a rule requiring the prescreening [of] lineups for some category of freestanding in-court identifications outside the jury's presence." Accordingly, the state sought permission to file a supplemental brief addressing the feasibility of those alternative procedures. This court granted the state's motion. As we previously have indicated in this opinion, contrary to the state's contention in its supplemental brief, we see no reason why an out-of-court lineup or photographic array would not be a feasible procedure to avoid the inherent suggestiveness and potential unreliability of an in-court identification. In any event, the state conceded in its motion for permission to file a supplemental brief that the defendant had asked this court to preclude in-court identifications entirely. Thus, by identifying procedures by which the state may avoid preclusion of an in-court identification, we are *broadening* the range of options that are available to the state. If the state believes in any particular case that the costs of seeking an out-of-court identification will outweigh the benefits of presenting an in-court identification, it may choose not to take advantage of those procedures.

Justice Zarella states conclusorily that "the parties have not had the opportunity to brief the issue of whether to adopt [the prescreening procedures that we adopt herein] . . . ." See footnote 3 of Justice Zarella's concurring opinion. As the foregoing procedural history shows, however, the parties were afforded ample opportunity to brief both the questions of whether first time in-court identifications implicate due process principles and, if so, what the proper remedy should be.

[28] For example, in the present case, although the defendant disputes Lyles' testimony that the defendant was Weibel's assailant, he does not dispute Lyles' ability to identify him. Accordingly, Lyles was properly permitted to make a first time in-court identification of the defendant.

[29] We reject the defendant's suggestion that a first time in-court identification may be allowed if the trial court determines that the identification would be reliable under the *Biggers* factors. *Biggers* traditionally has been applied when the witness' ability to make a reliable in-court identification has already been tainted by an unnecessarily suggestive identification procedure that the trial court was powerless to prevent. In our view, it would make little sense for the trial court to perform a *Biggers* analysis to determine whether it should permit the state to conduct an unnecessarily suggestive

procedure *in the future* when other, nonsuggestive alternatives are available.

[30] Although it is impossible to catalogue all of the reasons that might justify allowing an eyewitness to make another attempt to identify the defendant, a second procedure might be justified, for example, when the witness failed to identify the defendant in a photographic array and the state wants to conduct a lineup, or when the witness was threatened or intimidated before the first attempt.

[31] Of course, if the state has conducted an out-of-court identification procedure in compliance with the procedures that we adopt herein and the defendant contends that the procedure was unnecessarily suggestive, the court must then determine whether the identification procedure was, in fact, unnecessarily suggestive and, if so, whether the identification was nevertheless sufficiently reliable to be admissible under the *Biggers* factors.

[32] But see *Commonwealth* v. *Collins*, supra, 470 Mass. 262–63 (if eyewitness lacked confidence in out-of-court identification, in-court identification is barred because witness may "regard the defendant's prosecution as confirmation that the defendant is the 'right' person and, as a result, may develop an artificially inflated level of confidence in [his or her] in-court identification"). We disagree with the court's conclusion in *Collins*. Rather, because any inconsistencies between the eyewitness' level of confidence at the initial identification and at the in-court identification can be brought out on cross-examination, that is a sufficiently effective tool under these circumstances to counter the inherent suggestiveness of the in-court identification. Moreover, the defendant can present expert testimony that there is a weak correlation between confidence and accuracy, that memory degrades over time, and that "witnesses may develop unwarranted confidence in their identifications if they are privy to postevent or postidentification information . . . ." *State* v. *Guilbert*, supra, 306 Conn. 253.

[33] Some older United States Supreme Court cases hold that prophylactic constitutional rules are prospective only. See *Michigan* v. *Payne*, 412 U.S. 47, 93 S. Ct. 1966, 36 L. Ed. 2d 736 (1973) (declining to apply prophylactic rule set forth in *North Carolina* v. *Pearce*, 395 U.S. 711, 723–26, 89 S. Ct. 2072, 23 L. Ed. 2d 656 [1969], retroactively to cases pending on direct review); *Johnson* v. *New Jersey*, 384 U.S. 719, 732, 86 S. Ct. 1772, 16 L. Ed. 2d 882 (1966) (declining to apply prophylactic rule set forth in *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 [1966], retroactively to cases pending on direct review). We do not believe that these cases are compatible with the United States Supreme Court's later decision in *Griffith*. See *People* v. *Harris*, 123 Ill. 2d 113, 130, 526 N.E.2d 335 (1988) (implying that *Johnson* was overruled by *Griffith*); but see *Cowans* v. *Bagley*, 624 F. Supp. 2d 709, 734–36 (S.D. Ohio 2008) (assuming that prophylactic rules, such as that set forth in *Miranda*, are not grounded in federal constitution and concluding that *Griffith* applies only to rules required by federal constitution). No less than when a new rule is designed to remedy a constitutional violation, when a new rule is designed to prevent the significant risk of a constitutional violation, "the integrity of judicial review requires that we apply that rule to all similar cases pending on direct review." *Griffith* v. *Kentucky*, supra, 479 U.S. 323; see also *Dickerson* v. *United States*, 530 U.S. 428, 444, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000) ("*Miranda* announced a constitutional rule"). Indeed, the new rule that was at issue in *Griffith* was the rule set forth in *Batson* v. *Kentucky*, 476 U.S. 79, 97, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), requiring a prosecutor to provide a neutral explanation for the use of a peremptory challenge to strike a member of the defendant's race from the jury venire, reasonably could be characterized as a prophylactic rule. See B. Landsberg, "Safeguarding Constitutional Rights: The Uses and Limits of Prophylactic Rules," 66 Tenn. L. Rev. 925, 939 (1999) (characterizing *Batson* rule as at least partially prophylactic).

[34] The new rule would not apply, however, on collateral review. This question is governed by the framework set forth in *Teague* v. *Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989). See *Casiano* v. *Commissioner of Correction*, 317 Conn. 52, 62, 115 A.3d 1031 (2015). Under *Teague*, a "new" constitutional rule, i.e., a rule that "was not dictated by precedent existing at the time the defendant's conviction became final," generally does not apply retroactively. (Internal quotation marks omitted.) Id. There are two exceptions, however, to this general rule. Specifically, a new rule will apply retroactively if it is substantive or, if the new rule is procedural, when it is "a watershed [rule] of criminal procedure . . . implicit in the concept of ordered liberty . . . ." (Citation omitted; internal quotation marks omitted.) Id., 63. Because the rule that we adopt in the present case is a new procedural rule, we must determine whether it is a watershed rule. To be considered a watershed rule, the rule must "implicat[e] the fundamental fairness and accuracy of [a] criminal proceeding"; (internal quotation marks omitted) id.; or "[alter] our understanding of the bedrock procedural ele-

ments essential to the fairness of a proceeding . . . .” (Citation omitted; internal quotation marks omitted.) Id. Watershed rules “include those that raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise.” (Internal quotation marks omitted.) Id. The exception is “narrowly construed . . . and, in the twenty-five years since *Teague* was decided, [the United States Supreme Court] has yet to conclude that a new rule qualifies as watershed.” Id.; but see id., 64 (this court may construe *Teague* more liberally than United States Supreme Court); id., 69 (concluding that new procedural rule requiring individualized sentencing of juvenile before life sentence may be imposed is watershed rule under *Teague*). In the present case we conclude that the rule requiring prescreening of first time in-court identification does not fall within the narrow exception because: (1) as we have explained, the rule is prophylactic and a violation of the rule does not necessarily rise to the level of a due process violation; and (2) the rule is merely an incremental change in identification procedures. Cf. *Beard* v. *Banks*, 542 U.S. 406, 419–20, 124 S. Ct. 2504, 159 L. Ed. 2d 494 (2004) (“the fact that a new rule removes some remote possibility of arbitrary infliction of the death sentence does not suffice to bring it within *Teague*’s second exception”); id., 419 (although new rule was intended to enhance accuracy of capital sentencing, “because it effected an incremental change, [the United States Supreme Court] could not conclude that . . . [it was] an absolute prerequisite to fundamental fairness” [internal quotation marks omitted]).

[35] Of course, if the record is adequate for review of the reliability and admissibility of the in-court identification, the reviewing court may make this determination. For example, if the eyewitness had a full and fair opportunity to identify the defendant before trial and was unable to do so, the reviewing court reasonably could conclude that the subsequent in-court identification was unreliable.

[36] We cannot be certain that Weibel’s in-court identification was so unreliable as to be inadmissible because the record is inadequate for us to subject the identification to a *Biggers* analysis. Moreover, although Weibel was unable to identify the defendant in a photographic array, there is no way of knowing whether Weibel would have been able to identify the defendant in a lineup.

[37] Defense counsel also brought out some minor inaccuracies in Lyles’ testimony under direct examination. For example, Lyles testified on direct examination that he had learned that Weibel would be accompanied by a friend when Weibel called him at Perez’ apartment, while he testified on cross-examination that he learned that fact when Weibel called him at the scene of the crime. In addition, Lyles testified on direct examination that he left the residence on Louis Street alone, while he testified on cross-examination that he left with Reyes and the defendant.

[38] Specifically, the following exchange occurred between defense counsel and the defendant’s mother:

“Q. And do you recall who arrived with what groups, if you can remember?

“A. I remember the first two to get there was [the defendant’s aunt] and Jason [Temple]. I remember when—I don’t remember when Laurie [Council] got there. I was in the bathroom and I came out, she was already there. [The defendant], Jaquisha [Griffin] and her mom came in together. Mom didn’t stay long, she left. The other two kids, I remember them coming, I don’t know how they got there, but I remember them coming.

“Q. And was it the intention to get there to watch the game?

“A. Yes, we got there before kickoff.

“Q. And do you roughly know what that time was . . . the beginning of the game?

“A. I would say probably—the game probably started about 8:30, 9 o’clock. I—I didn’t, you know—

“Q. But you don’t know the exact time?

“A. No, [exact] timing I couldn’t tell you.”

Thus, the defendant’s mother testified equivocally that “we” arrived at the bar before kickoff. By referring to “we,” she might have been referring only to herself and her husband. She never expressly testified that *the defendant* arrived before kickoff.

[39] The following exchange took place between the prosecutor and the defendant’s aunt:

“Q. What time did [the defendant] get to the party?

“A. He got to the party—it was, I want to say it was—I know it was before kickoff but I can’t give you an exact time.

“Q. Okay. Do you know what time the kickoff was?

“A. Kickoff started about—little after 9 [p.m.]. Not exactly 9 o’clock. It was a little after 9.”

[40] The court gave the following jury instruction: "Weibel testified that [the defendant] was the person who committed the crimes. The identification of the defendant by a single witness as the one involved in the commission of a crime is, in and of itself, sufficient to justify conviction provided of course that you are satisfied beyond a reasonable doubt of the identity of the defendant as the person who committed the crime or crimes.

"In arriving at a determination on the issue of identification, you should consider all the facts and circumstances that existed at the time of the witness' observation of the perpetrator.

"Since identification testimony is an expression of belief or impression by the witness, the value of the testimony depends upon the opportunity and ability of the witness to observe the perpetrator at the time . . . of the event and the ability to make an accurate identification later.

"You must decide how much weight to place on . . . Weibel's identification testimony. In appraising his testimony you should take into account whether . . . Weibel had adequate opportunity and ability to observe the perpetrator on the date in question. This will be affected by such considerations as length of time available to make the observation, the distance between the witness and perpetrator, the lighting conditions at the time of the offense, whether the witness had known or seen the person [on] an earlier occasion, any history between them . . . whether anything distracted the attention of the witness during the incident. You should also consider the witness' physical and emotional condition at the time of the . . . confrontation and the witness' powers of observation in general.

"You should consider the length of time that elapsed between the occurrence of the crime and the identification of the defendant by the witness. You may also consider the strength of the identification including the witness' degree of certainty. Certainty, however, does not mean accuracy. You should take into account the circumstances under which the witness first observed and identified the defendant, the suggestibility, if any, of the procedure used in that viewing, physical descriptions that the witness may have given to the police, and any other factors which you find that relate to the reliability of the identification of the defendant.

"You may also consider whether the identification witness some time before the trial was shown a photo[graphic] array that included a photo-[graph] of the defendant. And whether or not he failed to identify the defendant at that time.

"Picking a defendant out of a group of similar individuals is generally more reliable than a procedure involving the presentation of the defendant alone to a witness.

"You will subject the testimony of the identification witness to the same standards of credibility that apply to all witnesses. It is not sufficient that the witness be free from doubt as to the correctness of the identification of the defendant. Rather, you must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may find him guilty on a charge.

"In short, you must consider the totality of the circumstances [a]ffecting the identification. Remember the state has the burden to not only prove every single element of the crime but also the identity of the defendant as the perpetrator of the crime.

"You must be satisfied beyond a reasonable doubt of the identity of the defendant as the one who committed the crime or crimes or you must find the defendant not guilty.

"If you have a reasonable doubt as to the accuracy of the identification you must find the defendant not guilty."

[41] As we have indicated herein, when asked by defense counsel, Lyles denied that the person who he previously had committed robberies with—who he claimed to know only as "Black"—was the cousin who had access to the e-mail account that Lyles had used to lure his victims. The state presented no evidence other than this denial, however, that "Black" *was* his cousin or that Lyles was motivated by a desire to protect him.