******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* XAVIER RIVERA
## (SC 20539)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of murder, conspiracy to commit assault in the first degree, unlawful restraint in the first degree, unlawful discharge of a firearm, and carrying a pistol or revolver without a permit in connection with the shooting death of the victim, the defendant appealed. The defendant had gone with two other individuals, V and C, to an automobile parts store in Bridgeport to confront the victim about a break-in in which the defendant believed the victim was involved. The victim was ultimately shot and killed on a street adjacent to the store parking lot. V testified at the defendant's trial that he had witnessed the defendant strike the victim in the face with a gun and drag him across the parking lot. V also testified that he had heard gunshots and witnessed the defendant drive away from the scene in his car. In addition, approximately two weeks after the shooting, the police approached V about the victim's death, and V thereafter used a cell phone to surreptitiously record a conversation between him and the defendant in which the defendant allegedly confessed to his commission of the murder. V returned to the police station, played the audio recording of the conversation on his cell phone for the police, and e-mailed an electronic copy of the recording to the police. The police transferred a copy of the recording to a DVD, which was admitted into evidence. V testified that he had listened to the recording on the DVD proffered by the state and that the recording had not been manipulated since it was recorded. V also testified that he no longer possessed the cell phone that he had used to record the conversation, and, as a result, the original recording was no longer available. Another eyewitness to the events in question, R, testified that he saw a man dressed in all white pistol whip the victim multiple times. The state and the defense entered into a stipulation, which was provided to the jury, that R was unable to identify the defendant as the individual whom R identified as wearing all white when, prior to trial, R was presented with a photographic array that included a photograph of the defendant. The Appellate Court affirmed the judgment of the trial court, and the defendant, on the granting of certification, appealed to this court. *Held*:

1. The defendant could not prevail on his claim that the Appellate Court incorrectly concluded that the trial court had not abused its discretion in admitting into evidence the DVD containing the audio recording of his alleged confession:

   a. There was no merit to the defendant's claim that the recording was inadequately authenticated and, therefore, was inadmissible under the Connecticut Code of Evidence (§ 9-1): the fact that the recording proffered by the state was stored electronically did not require a meaningful departure from well established methods of authentication; moreover, the state made a prima facie showing of the recording's authenticity, as V testified that he personally recorded the conversation, that he subsequently e-mailed an electronic copy of the recording to the police, that the recording proffered by the state had not been altered, and that he was familiar with the voices on that recording, and the detective who received the electronic copy of the recording testified that he had received that copy from V via e-mail and then transferred it to the DVD that the state was seeking to introduce; furthermore, once the state made its prima facie showing, the evidence was admissible, and the ultimate determination of authentication and what weight to give that evidence was for the jury.

   b. The defendant's claim that the unavailability of the original recording stored on V's cell phone rendered subsequent electronic copies of that recording inadmissible under the best evidence rule was unavailing; unchallenged testimony established that the original recording was no longer available, the defendant conceded that there was no indication

that V lost or destroyed his cell phone with the intention of making the original recording unavailable for trial, and, in the absence of any claim that the state had destroyed or lost the original in bad faith in order to avoid producing it, the DVD containing an electronic copy of the original recording was admissible under the Connecticut Code of Evidence (§ 10-3) as a form of secondary evidence of the contents of the original recording.

2. The defendant could not prevail on his claim that the Appellate Court incorrectly concluded that the trial court had not abused its discretion when it directed the jury to disregard portions of defense counsel's closing argument concerning the prosecutor's failure to ask R for an in-court identification of the defendant, as any error on the part of the trial court was harmless: the state conceded R's inability to identify the defendant as the person whom he identified as the man in white through its stipulation to the fact that R was unable to pick the man wearing all white out of a photographic array that included a photograph of the defendant, defense counsel emphasized this point repeatedly during his closing argument without comment or contradiction by the prosecutor, and, therefore, this court could not conclude that the exclusion of a single, inferential argument relating to R's continued inability to identify the defendant at trial would have changed the result that the jury reached; moreover, it was undisputed that the state's case against the defendant did not include a definitive identification from any neutral witnesses, as all of the witnesses to the events in question could provide only a general description of the person in white, and R's testimony accounted for only a small portion of the evidence presented in the state's strong case against the defendant.

Argued January 12—officially released June 21, 2022

*Procedural History*

Two part substitute information charging the defendant, in the first part, with the crimes of murder, conspiracy to commit assault in the first degree, unlawful restraint in the first degree, unlawful discharge of a firearm and carrying a pistol or revolver without a permit, and, in the second part, with criminal possession of a firearm, brought to the Superior Court in the judicial district of Fairfield, where the first part of the information was tried to the jury before *Kavanewsky, J.*; verdict of guilty; thereafter, the state entered a nolle prosequi as to the second part of the information, and the court, *Kavanewsky, J.*, rendered judgment in accordance with the verdict; subsequently, the defendant appealed to this court, which transferred the appeal to the Appellate Court, *Alvord*, *Elgo* and *Pellegrino, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Lisa J. Steele*, assigned counsel, for the appellant (defendant).

*Kathryn W. Bare*, senior assistant state's attorney, with whom, on the brief, were *Joseph T. Corradino*, state's attorney, and *Marc R. Durso*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KAHN, J. The defendant, Xavier Rivera, appeals from the judgment of the Appellate Court, which affirmed the judgment of the trial court, rendered after a jury trial, convicting him of the crimes of murder in violation of General Statutes § 53a-54a (a), conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and 53a-48, unlawful restraint in the first degree in violation of General Statutes § 53a-95, unlawful discharge of a firearm in violation of General Statutes § 53-203, and carrying a pistol or revolver without a permit in violation of General Statutes § 29-35 (a). In the present appeal, the defendant claims that the Appellate Court incorrectly concluded that the trial court had not abused its discretion by (1) admitting an audio recording allegedly containing his confession into evidence, and (2) directing the jury to disregard portions of defense counsel's closing argument relating to the absence of an in-court identification from one of the state's witnesses. For the reasons that follow, we reject both of those claims and, accordingly, affirm the judgment of the Appellate Court.

The following undisputed facts and procedural history are relevant to our consideration of the present appeal. The victim, Miguel Rivera,[1] was shot and killed on North Avenue in the city of Bridgeport at 12:22 a.m. on December 24, 2016. A specialized group of detectives in the Bridgeport Police Department gathered video surveillance footage from various security cameras in the area around that shooting. Video surveillance footage from one set of cameras located at an auto repair shop one block south from the scene of the shooting shows two vehicles turning onto North Avenue from River Street at approximately 12:18 a.m. The first of those two vehicles pulled into the parking lot of a strip club located near that intersection. Two individuals dressed in black exited from that vehicle, crossed to the other side of North Avenue, and then can be seen walking north toward the parking lot of a nearby Auto-Zone store. That footage also shows the second vehicle, which the police subsequently identified as a Cadillac DTS,[2] driving north for a few hundred feet and eventually parking in front of an office building located across the street from the southern entrance to the AutoZone parking lot.

A second set of video surveillance cameras, located at a fast food restaurant just north of that office building and directly across North Avenue from AutoZone, shows one individual dressed in all white, and then later two individuals dressed in black, walking into the AutoZone parking lot. Moments later, footage from those same video surveillance cameras shows the person in white dragging the victim back toward the parking lot's southern entrance.[3] At that same moment, one of the two people in black can be seen extending his arm as if he

was pointing a handgun at the cars located behind them.

Additional footage from video surveillance cameras at the auto repair shop shows the victim being forced across North Avenue by the person in white and by one of the two people in black. The victim is then eventually pushed out of view alongside of the southern wall of the office building. A few seconds later, the victim can be seen running back out onto the street and fleeing north for a short distance, where he ultimately collapsed and died on the sidewalk in front of the fast food restaurant.[4] The Cadillac can then be seen moving in reverse, turning around, and driving away to the south without its headlights on. Two individuals dressed in black then walk to the car parked near the strip club and drive away at approximately 12:23 a.m.

The state presented physical and forensic evidence at trial. The medical examiner assigned to this case, Frank Evangelista, testified that the victim had suffered blunt force trauma to the face and a total of four gunshot wounds to his torso and lower extremities. One of those gunshot wounds entered the victim's back and exited from his chest. The victim sustained two other gunshot wounds to his thighs, and a fourth gunshot wound to his left knee. Three of these shots went completely through the victim's body; the fourth, however, left a bullet lodged in the victim's left thigh. Evangelista testified that the victim had bled to death and stated that the process would not have been instantaneous.

A firearms examiner, Marshall Robinson, testified that bullets and casings connected to this crime came from two distinct guns: a .22 caliber revolver and a nine millimeter Luger semiautomatic firearm. Robinson testified that the bullet recovered from the victim's left thigh and another found by the police on North Avenue came from the .22 caliber weapon, whereas four bullet casings discovered on the southern side of the office building came from the nine millimeter Luger firearm. Neither of these weapons was ever found by the police.

The state also presented testimony from various witnesses who were near the scene of the shooting. The first of those witnesses, McDonald Bogues, was in his car outside of the fast food restaurant with his wife, Rosemarie Dixon. Bogues testified that he heard what he had initially thought was a car backfiring across the street at AutoZone, and then started to see cars speeding out of the nearby parking lot. Bogues then saw four men on the other side of North Avenue: (1) the victim, who was wearing black, (2) a second man dressed in black who was pulling the victim, (3) a taller,[5] lighter-skinned man dressed in "full white" that was pushing the victim and holding a semiautomatic pistol, and (4) a third man dressed in black who was standing farther away and "wasn't in the mix of things." Bogues eventually lost sight of the altercation after the victim was forced across the street but then heard a single gunshot followed by three

more in quick succession. After the victim had run back onto the street and collapsed on the sidewalk in front of the fast food restaurant, Bogues saw the man in white get into a "dark[er]" colored car parked on North Avenue, turn around in reverse, and then drive away without its headlights on.

Like Bogues, Dixon testified that a man dressed in white and one of the men dressed in black had dragged the victim across the street and that, shortly after they moved out of sight, she heard a series of gunshots. Dixon also described the individual in white as a taller man with a fair complexion and stated that she had called the police after seeing a black handgun in his right hand. After the victim had run out onto North Avenue and collapsed on the sidewalk in front of the fast food restaurant, Dixon saw the man in white getting into a dark colored car and turning around on North Avenue.

A third eyewitness, Jesus Rodriguez, was seated in his car in the AutoZone parking lot when the fight initially broke out. Specifically, Rodriguez testified that three men approached the car parked next to him and that a man dressed in all white had pulled the victim out of the passenger seat of that vehicle. Similar to the descriptions provided by both Bogues and Dixon, Rodriguez described the man in white as a tall, Hispanic male of average build. According to Rodriguez, the man in white then began asking where "his shit" was, pistol whipped the victim multiple times, and then pointed a gun at the victim's legs. Rodriguez heard a gunshot,[6] began to drive away, and called 911. As Rodriguez was leaving the parking lot, he saw a gold Cadillac driving away to the south on North Avenue.[7]

The most comprehensive account of the events preceding the victim's death, however, came from Alexis Vilar, who told the jury that he had gone with the defendant and a third individual, Moises Contreras, to the AutoZone that night in order to confront the victim about a break-in that had recently occurred at the home of the defendant's girlfriend. Vilar indicated that the defendant had lost marijuana, money, and certain other personal items during that break-in, and that the defendant had strongly suspected that the victim, who had previously dated the defendant's girlfriend, was responsible. According to Vilar, the three men left a concert on the eastern side of Bridgeport and began heading toward the AutoZone around midnight, the defendant, driving alone in his grey 2006 Cadillac DTS, and Vilar and Contreras driving together inside of Vilar's Acura TL. Vilar stated that, on that particular evening, both he and Contreras were wearing dark colors, whereas the defendant was wearing white.

Vilar testified that he and Contreras parked at the strip club near the intersection of River Street and North Avenue, while the defendant continued up the street for a short distance and parked across the street from

the AutoZone. By the time Vilar and Contreras eventually caught up to the defendant, he was already confronting the victim with a black nine millimeter handgun. Vilar testified that the defendant then began smacking the victim in the face with that gun and dragging the victim toward the southern end of the parking lot. Vilar indicated that, around that same time, Contreras fired a single shot from a small caliber revolver.

Vilar told the jury that that he was already heading back toward his Acura in the strip club's parking lot by the time Contreras and the defendant had dragged the victim across North Avenue. Vilar then heard another "small caliber shot," saw Contreras walking quickly toward him, and then heard a series of several louder shots in quick succession. Vilar testified that, after he and Contreras got back into the Acura, Contreras remarked, "I think [the defendant] finished him." Vilar stated that he then saw the defendant driving away in the Cadillac with the headlights off.

Finally, Vilar testified that, on January 11, 2017, police officers approached him to ask about the victim's death. Vilar subsequently retained an attorney, returned to meet with the police the following day, and proceeded to recount the events previously described. Vilar testified that, a few days after that meeting, he used a cell phone to surreptitiously record a conversation relating to the victim's death between him and the defendant. On January 19, 2017, Vilar returned to the police station, played the recording on his phone for the police, and then e-mailed a copy of it to one of the detectives. The police, in turn, saved a copy of that recording on to a DVD, which itself was introduced into evidence at trial as a full exhibit over defense counsel's objection. The person speaking with Vilar on that recording can be heard stating that "all [he] wanted to do was beat [the victim's] ass" that night but that he was forced to kill the victim in order to prevent him from going to the police after Contreras had shot the victim twice.[8]

The jury subsequently returned a verdict finding the defendant guilty of murder, conspiracy to commit assault in the first degree, unlawful restraint in the first degree, unlawful discharge of a firearm, and carrying a pistol without a permit. The trial court rendered a judgment of conviction in accordance with that verdict and imposed a total effective sentence of fifty-five years of incarceration. The defendant then appealed from that conviction, claiming, inter alia, that (1) his alleged confession was improperly authenticated and inadmissible under the best evidence rule, and (2) the trial court improperly instructed the jury to disregard an argument made by defense counsel in closing relating to the absence of an in-court identification from Rodriguez. See *State* v. *Rivera*, 200 Conn. App. 487, 488–89, 491, 501, 240 A.3d 728 (2020). The Appellate Court rejected both claims and affirmed the defendant's con-

viction. Id., 505. This certified appeal followed.[9] Additional facts and procedural history will be set forth as necessary.

I

The defendant's first claim is that the Appellate Court incorrectly concluded that the trial court had not abused its discretion by admitting the electronic recording of his alleged confession into evidence. Although his briefing on the issues are somewhat entwined, the defendant appears to raise two analytically distinct legal grounds on this point: (1) the recording was improperly authenticated and, therefore, inadmissible under § 9-1 of the Connecticut Code of Evidence, and (2) the unavailability of the original electronic recording stored on Vilar's cell phone and its associated metadata rendered subsequent electronic copies of that recording inadmissible under our state's best evidence rule. See Conn. Code Evid. §§ 10-1 through 10-3. The state responds by arguing, inter alia, that Vilar's testimony about the creation and contents of the recording provided a sufficient foundation for the purpose of admission under § 9-1. The state also argues that, in the absence of evidence that Vilar's cell phone was destroyed for the purpose of avoiding production of the original recording, the electronic copy proffered by the state at trial was admissible pursuant to § 10-3. For the reasons that follow, we agree with the state on both points.

The following additional facts and procedural history are relevant to our consideration of this issue. The exhibit presently at issue is a DVD containing a single multimedia file with a .3gp file extension. The recording on the DVD is approximately three minutes in length and contains a file date of January 19, 2017. The state's foundation for the admission of this exhibit came from two separate witnesses. Vilar testified that he secretly used his cell phone to record a conversation that he had with the defendant inside of a car outside a hookah lounge in Fairfield on January 15, 2017. Vilar then brought that recording to the police department on January 19, 2017, played it for the police on his cell phone, and sent a copy to them by e-mail. Vilar testified that he had listened to the recording on the DVD being proffered by the state and that the audio recording had not been manipulated since it was first recorded. Vilar specifically indicated that he recognized the two voices on the recording as the defendant's and his own.[10] Finally, Vilar testified that he no longer possessed the phone that he had used to record his conversation with the defendant and that, as a result, the original recording was no longer available. A police detective, Jorge Cintron, likewise testified that he had heard the audio recording when Vilar played it at the police department on January 19, 2017, that Vilar had e-mailed a copy of that recording to him later that same day, and that he had then saved a copy of that recording to the DVD

being proffered by the state. Cintron testified that he had listened to that recording and that it was the same as the one previously played for him by Vilar.

Defense counsel ultimately objected to the admission of the recording saved to the DVD, citing the absence of the original recording. Specifically, defense counsel argued that the gap in time between when Vilar allegedly recorded the conversation and when it was provided to the police was "enough to raise questions" about the recording's authenticity and its chain of custody. The prosecutor argued that the foundation previously laid was sufficient for admission.

The trial court overruled defense counsel's objection and admitted the recording into evidence, stating: "I think there's ample evidence of a sufficient chain of custody between how he says he recorded it; when he says he recorded it; how it was transmitted from his cell phone, apparently by e-mail, to the police. . . . Cintron . . . testified . . . as to how he made the DVD from the e-mail . . . [and] that what [Vilar] played for him at the police station was . . . the same . . . as what later went onto the DVD. . . . [Vilar] has testified to the same effect, [and] recognizes the . . . voices. . . . I think the rest of it goes to . . . the weight of the evidence but not the admissibility of the evidence. So, the objection is overruled."

The Appellate Court determined that there was no error with respect to this ruling. *State* v. *Rivera*, supra, 200 Conn. App. 489. Although not addressed directly, the Appellate Court decision appears to implicitly reject the defendant's claim that the foundation laid by the state was insufficient to satisfy the standards for authentication required by our code of evidence.[11] See id., 502–503. It was likewise unpersuaded by the defendant's best evidence argument. Id., 501–502. The following passage from that court's comprehensive decision on this point is, we think, particularly instructive: "Section 10-3 of the Connecticut Code of Evidence . . . provides that the original of a recording is not required, and other evidence of the contents of the recording is admissible, if [a]ll originals are lost or have been destroyed, unless the proponent destroyed or otherwise failed to produce the originals for the purpose of avoiding production of an original . . . . [I]t is clear that the original recording is no longer available, as it was on Vilar's cell phone, which was no longer in his possession at the time of the trial. . . . The defendant has failed to point to any evidence in the record demonstrating that the original recording was made unavailable for the purpose of avoiding its production at trial. Vilar played the original recording for the police and then e-mailed a copy of the recording to the police, per . . . Cintron's instructions. At no time did the police request or order that Vilar turn over the cell phone containing the original recording. Furthermore, both Vilar and . . . Cintron

verified that the copy of the recording e-mailed to the police was an exact copy of the original. On the basis of these facts, [the court] cannot conclude that the original recording was made unavailable for the purpose of avoiding its production. . . . Accordingly, the copy of the recording satisfies the requirement of § 10-3 of the Connecticut Code of Evidence . . . [and was therefore] admissible under [the code]." (Citation omitted; internal quotation marks omitted.) Id.

For the sake of simplicity, we address separately the defendant's claims with respect to authentication and the best evidence rule. The standard of review applicable to both of these claims is well established. "To the extent [that] a trial court's admission of evidence is based on an interpretation of the [c]ode of [e]vidence, our standard of review is plenary." *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007). "We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion." Id. "Under the abuse of discretion standard [an appellate court] make[s] every reasonable presumption in favor of upholding the trial court's rulings, considering only whether the court reasonably could have concluded as it did." *State* v. *Annulli*, 309 Conn. 482, 491, 71 A.3d 530 (2013).

A

Authentication

We begin by rejecting the defendant's claim that the foundation laid by the state at trial was inadequate to authenticate the recording of the defendant's alleged confession. The relevant provision of our code of evidence provides: "The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be." Conn. Code Evid. § 9-1 (a). This bedrock requirement, as the parties accurately observe, "applies to all types of evidence, including writings, sound recordings, electronically stored information, real evidence   .   .   . demonstrative evidence . . . and the like." Conn. Code Evid. § 9-1 (a), commentary. The burdens imposed by this rule are, however, not intended to be onerous. See, e.g., M. Baldwin et al., A Practical Guide to Evidence in Connecticut (2d Ed. 2021) § 9.2.1. "Once this prima facie showing is made, the evidence may be admitted, and the ultimate determination of authenticity rests with the fact finder." Conn. Code Evid. § 9-1 (a), commentary; see also *State* v. *Carpenter*, 275 Conn. 785, 856, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006).

Although evidence may be authenticated in several different ways, two specific methods suggested by the commentary to our code of evidence are notable in this case: (1) "[a] witness with personal knowledge may

testify that the offered evidence is what its proponent claims it to be"; and (2) "[a]ny person having sufficient familiarity with another person's voice, whether acquired from hearing the person's voice firsthand or through mechanical or electronic means, can identify that person's voice or authenticate a conversation in which the person participated." Conn. Code Evid. § 9-1 (a), commentary; see E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 9.8, p. 685 ("[T]he maker of an oral . . . communication may be identified by anyone familiar with the voice of the speaker. . . . If a minimal showing has been made, the statement should be admitted and the finder of fact will determine the weight to be given to the identification testimony." (Citations omitted.)); see also 2 R. Mosteller et al., McCormick on Evidence (8th Ed. 2020) § 228, pp. 115–16.

The fact that an audio recording proffered by the state was stored electronically does not, in our view, require a meaningful departure from these well established methods of authentication under the facts presented.[12] Cf. *State* v. *Manuel T.*, 337 Conn. 429, 460, 254 A.3d 278 (2020) ("[w]e see no justification for constructing unique rules of admissibility of electronic communications such as instant messages; they are to be evaluated on a case-by-case basis as any other document to determine whether . . . there has been an adequate foundational showing of their relevance and authenticity" (internal quotation marks omitted)). Vilar testified that he personally recorded the conversation, that he subsequently e-mailed a copy of the recording to the police, and that the recording proffered by the state had not been altered in any way. Vilar then identified the voices on that recording on the basis of his own familiarity with them. Cintron, likewise, testified that he had received a copy of that recording from Vilar via e-mail and then saved it to the DVD that the state was seeking to introduce. Once this prima facie showing was established, the evidence was admissible, and the ultimate determination of authentication and what weight to give that evidence was for the jury. See, e.g., *State* v. *Carpenter*, supra, 275 Conn. 856. On the record before us, we decline to conclude that the trial court abused its discretion by finding that the state had laid an adequate foundation for the admission of this recording into evidence.[13]

B

The Best Evidence Rule

We likewise reject the defendant's argument that the admission of the DVD containing an electronic copy of his alleged confession violated the strictures of our state's best evidence rule. The defendant argues that, because the recording on the DVD was made from Vilar's e-mailed copy, it cannot be considered either an original in its own right or a copy admissible in lieu of the original. See Conn. Code Evid. §§ 10-1 and 10-2.

Although not raised before the trial court, the defendant now argues on appeal that the copy of the recording proffered by the state should not have been admitted because, without the original recording, he lacked access to the metadata associated with the original recording. Even if we were to agree with the defendant's reading of §§ 10-1 and 10-2, however, the unchallenged testimony relating to the loss of the original recording would nonetheless compel us to uphold the trial court's admission of the DVD as a permissible form of secondary evidence. See Conn. Code Evid. § 10-3.

We begin with a brief review of the relevant rules of evidence. Section 10-1 of the Connecticut Code of Evidence provides: "To prove the content of a writing, recording or photograph, the original writing, recording or photograph must be admitted in evidence, except as otherwise provided by the Code, the General Statutes or any Practice Book rule adopted before June 18, 2014, the date on which the Supreme Court adopted the Code. An original of electronically stored information includes evidence in the form of a printout or other output, readable by sight or otherwise shown to reflect the data accurately." This rule generally applies to audio recordings offered to prove the content of a previous conversation. See 2 R. Mosteller et al., supra, § 234, pp. 138–39 ("[A] conversation between two people is an event that may be proved either by testimony from the participants (or from anyone else who heard the conversation) as to what was said or a tape recording made of the conversation. If the proponent chooses to prove what was said during the conversation by use of [a] tape recording, then [that] tape is being offered to prove its own contents. The requirement of the original tape would apply." (Footnote omitted.)).[14]

When the original writing, recording or photograph is unavailable, courts should begin by examining the exceptions set forth in § 10-3 of the Connecticut Code of Evidence. That rule provides in relevant part: "The original of a writing, recording or photograph is not required, and other evidence of the contents of such writing, recording or photograph is admissible if: (1) . . . [a]ll originals are lost or have been destroyed, unless the proponent destroyed or otherwise failed to produce the originals for the purpose of avoiding production of an original . . . ." Conn. Code Evid. § 10-3. These exceptions are rooted in the fact that the common-law best evidence rule expresses "a rule of preference rather than one of exclusion." Conn. Code Evid. § 10-3, commentary; see also 2 R. Mosteller et al., supra, § 237, p. 152 ("[t]he requirement of producing the original of a writing, recording or photograph is principally aimed, not at securing an original document at all hazards and in every instance, but at securing *the best obtainable evidence* of its contents" (emphasis added)).

As stated previously in this opinion, the testimony

adduced by the state at trial demonstrated that the original recording on Vilar's cell phone was no longer available. Although the defendant characterizes the unavailability of Vilar's cell phone as "suspicious" in briefing the present appeal, a detailed review of the record shows that this argument was never raised, either explicitly or implicitly, during the course of trial. The defendant himself candidly concedes in his brief that there is "no evidence that Vilar lost or destroyed his [cell] phone with the intention of making the original recording unavailable for trial." We agree with the Appellate Court's assessment that, in the absence of any claim that the state had destroyed or lost the original in order to avoid its production before the trial court, the DVD copy made by Cintron was admissible under the exception set forth in § 10-3 as a form of secondary evidence of the contents of that original recording. See, e.g., *United States* v. *Lanzon*, 639 F.3d 1293, 1301–1302 (11th Cir.) (concluding that "transcripts were admissible under [rule 1004 of the Federal Rules of Evidence] because they contain evidence of the conversations and the originals were not destroyed in bad faith"), cert. denied, 565 U.S. 916, 132 S. Ct. 333, 181 L. Ed. 2d 208 (2011); *United States* v. *Knohl*, 379 F.2d 427, 439–41 (2d Cir.) (copy of audio recording made by federal law enforcement officers was admissible as secondary evidence after original recording was lost by government witness), cert. denied, 389 U.S. 973, 88 S. Ct. 472, 19 L. Ed. 2d 465 (1967); see also, e.g., *United States* v. *Gerhart*, 538 F.2d 807, 809–10 (8th Cir. 1976) (photocopy of photocopy was admissible when govenrment established that "the original photocopy was lost, that the proffered photocopy was what it purported to be and it accurately reflected the contents of the original photocopy"); 2 R. Mosteller et al., supra, § 234, pp. 138–39 (secondary evidence, such as written transcripts, is admissible to prove contents of conversation when original audio recording is "shown to be unavailable"). Because there was no claim that the original recording was lost in bad faith, the defendant's challenge under the best evidence rule must fail.

II

The defendant's final claim is that the trial court abused its discretion by impermissibly restricting the scope of defense counsel's closing argument. Specifically, the defendant argues that the trial court improperly instructed the jury to disregard defense counsel's statements relating to the absence of an in-court identification from Rodriguez. The state responds by arguing that the trial court's instruction was proper and that, even if it was not, any error was harmless. For the reasons that follow, we agree with the state that any error by the trial court related to this claim was harmless.[15]

The following additional facts and procedural history

are relevant to our consideration of the defendant's claim. The state presented testimony from Rodriguez on the third day of trial. During his direct examination, the prosecutor asked Rodriguez whether he was "asked [by the police] to make an identification of . . . the individual who [he] witnessed as the male in white on the night in question." Before Rodriguez answered that question, the trial court called for a discussion with counsel at side bar. After that off-the-record discussion, the prosecutor withdrew his question and concluded his direct examination. Later that same day, the trial court provided the jury with the following oral stipulation at the request of the parties: "As to . . . Rodriguez' testimony . . . counsel stipulate . . . that, on [January 21, 2017] . . . Rodriguez was at the Bridgeport Police Department for an interview. He was shown a photo[graphic] array of eight photographs, one of which was a photograph of the defendant. Then he was asked to see if he could identify anyone from those eight photo[graphs] as the person he saw all in white at the scene that evening. And he did not make any identification from that photograph[ic] array."

Defense counsel ultimately presented the following argument to the jury in closing: "Rodriguez, the state's own witness, came in . . . and he testified . . . about what happened or what he saw in the lot. And, at the end, when he finished, there was a stipulation that was entered on agreement between the prosecutor and me. And you ask to hear it. It's there. He was shown photographs, an array of photographs that included [the defendant's photograph] and . . . he did not pick [the defendant out] as the shooter, okay, as the guy in white, as anybody being involved in any of that situation over there. And he was in court. He was on the witness stand. Did the prosecutor . . . say to him, hey, do you see the guy in this courtroom who you saw? And he's sitting in the car. You remember what he said, ladies and gentlemen? He's sitting in a car right here, right across the street from the [office] building in the Auto-Zone parking lot, and his car is facing North Avenue, and he sees all this stuff happening over here. He's looking at all the stuff going on here. Does . . . the [prosecutor] say to him, hey . . . Rodriguez, do you see the guy here in the courtroom? No, never says anything." Defense counsel's closing argument ended just prior to the luncheon recess.

After excusing the jury for lunch, the trial court raised three areas of concern that it noted in defense counsel's argument and advised counsel it would hear any arguments relating to them after the recess. With respect to the line of argument relating to the prosecutor's failure to ask Rodriguez for an in-court identification, the trial court expressed its own view that the argument was improper "because the law is that, if somebody cannot make an out-of-court identification . . . the state is precluded by law from asking the witness

[whether he sees that] guy in court . . . [a]nd, so, you know, you can't have it both ways so to speak." The trial court explained its understanding of the developments of the law in this area. Prior to the recess, the prosecutor agreed with the trial court's view of the law and requested a curative instruction.

When the trial court reconvened, the prosecutor, citing this court's decision in *State* v. *Dickson*, 322 Conn. 410, 141 A.3d 810 (2016), cert. denied,      U.S.     , 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017), agreed with the trial court's concern and offered to address it on rebuttal or, alternatively, requested a curative instruction. Defense counsel responded by asserting that an in-court identification would have been permissible under the law "when a witness cannot make a [photographic identification] or has not [been] given an . . . opportunity to make a [photographic identification]" and that, as a result, his arguments about the absence of such an identification were proper.

The trial court then provided the jury with the following instruction: "You heard me say before that arguments of the attorney are just that, arguments, but not evidence, but I'm going to instruct you to disregard two lines of questions or two areas of questioning, I should say of part of [defense counsel's] closing argument, two parts of his closing argument; and that is when the defense said—and I'm paraphrasing now—when [Rodriguez] . . . who testified as a witness in court, I think it was suggested the, well, the state did not ask him whether or not he could identify the defendant here in court. Disregard that question and any thought of that question. All right. You don't need to know the reason why, but I'm telling you just to disregard that line of questioning." After briefly turning to address a second issue that is not relevant to the present appeal,[16] the trial court told the jury that "[t]he rest of [defense counsel's] argument can stand . . . ."

The parties do not contest the trial court's broad authority over the scope of the arguments before it. As the Appellate Court in the present case aptly observed, "it is within the discretion of the trial court to limit final arguments for the purpose of preventing comments on facts not properly in evidence, [and to] . . . [prevent] the jury from considering matters in the realm of speculation . . . ." (Internal quotation marks omitted.) *State* v. *Rivera*, supra, 200 Conn. App. 494, quoting *State* v. *Arline*, 223 Conn. 52, 59, 612 A.2d 755 (1992). "A trial court has wide discretion to determine the propriety of counsel's argument and may caution the jury to disregard improper remarks in order to contain prejudice." *State* v. *Herring*, 210 Conn. 78, 102, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989); see also *Herring* v. *New York*, 422 U.S. 853, 862, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975) ("The presiding judge must be and is given latitude in controlling the

duration and limiting the scope of closing summations. [The judge] may limit counsel to a reasonable time and may terminate argument when continuation would be repetitive or redundant. [The judge] may ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial. In all these respects [the judge] must have broad discretion.").

The principles of law animating the trial court's invocation of this authority in the present case, as the prosecutor accurately observed at trial, arise from this court's decision in *State* v. *Dickson*, supra, 322 Conn. 410. In that case, we concluded that "first time in-court identifications, like in-court identifications that are tainted by an unduly suggestive out-of-court identification, implicate due process protections and must be prescreened by the trial court." Id., 426. This court detailed that procedure at length: "In cases in which there has been no pretrial identification . . . and the state intends to present a first time in-court identification, the state must first request permission to do so from the trial court. . . . The trial court may grant such permission only if it determines that there is no factual dispute as to the identity of the perpetrator, or the ability of the particular eyewitness to identify the defendant is not at issue. . . .

"If the trial court determines that the state will not be allowed to conduct a first time identification in court, the state may request permission to conduct a nonsuggestive identification procedure, namely, at the state's option, an out-of-court lineup or photographic array, and the trial court ordinarily should grant the state's request. If the witness previously has been unable to identify the defendant in a nonsuggestive identification procedure, however, the court should not allow a second nonsuggestive identification procedure unless the state can provide a good reason why a second bite at the apple is warranted. If the eyewitness is able to identify the defendant in a nonsuggestive out-of-court procedure, the state may then ask the eyewitness to identify the defendant in court.

"If the trial court denies a request for a nonsuggestive procedure, the state declines to conduct one, or the eyewitness is unable to identify the defendant in such a procedure, a one-on-one in-court identification should not be allowed. The prosecutor may still examine the witness, however, about his or her observations of the perpetrator at the time of the crime, but the prosecutor should avoid asking the witness if the defendant resembles the perpetrator." (Citations omitted; footnotes omitted.) Id., 445–447. *Dickson* further provides that, when an in-court identification is prohibited by the trial court pursuant to these procedures, the prosecutor may request an instruction indicating that "an in-court identification was not permitted because inherently suggestive first

time in-court identifications create a significant risk of misidentification and because either the state declined to pursue other, less suggestive means of obtaining the identification or the eyewitness was unable to provide one." Id., 449.

The dispute in this appeal centers on the indirect impact that *Dickson* may have had on the permissible scope of closing arguments. The defendant claims that remarks made by defense counsel relating to the state's failure to elicit an in-court identification from Rodriguez amounted to no more than a routine comment on the absence of evidence. The state argues in response that, under *Dickson*, the results of the previously administered photographic array precluded it from eliciting a subsequent in-court identification from Rodriguez and that, as a result, defense counsel's remarks on the point were unfair. Put differently, the state claims that defense counsel's argument misled the jury to believe that the reason the Rodriguez was not asked to undertake an in-court identification was because he was incapable of identifying the defendant, rather than that the law prohibits such an identification due to its suggestive nature and unreliability. In the alternative, the state argues that the Appellate Court's affirmance of the trial court's judgment may be upheld on the ground that any error on the point was harmless. We agree with the state's latter contention for three reasons.[17]

First, Rodriguez' inability to identify the defendant as the man in white had already been conceded by the state through its stipulation to the fact that Rodriguez had been unable to pick the man in white out of a photographic array that had included a photograph of the defendant. Indeed, defense counsel emphasized this point repeatedly during the course of his closing argument and expressly invited the jury to review the stipulation during its deliberations. In light of the fact that these repeated references went without comment or contradiction by the prosecution, we are unable to accept the defendant's assertion that the exclusion of a single, inferential argument relating to Rodriguez' continued inability to identify the defendant at the time of trial would have ultimately changed the result reached by the jury.[18]

Second, on a broader level, it was undisputed that the state's case against the defendant did not include a definitive identification from any *neutral* witnesses. There is no dispute that Bogues, Dixon, and Rodriguez were able to provide the jury only with a general description of the person in white as a taller Hispanic male with an average build.

Finally, Rodriguez' testimony accounted for only a small portion of the evidence arrayed against the defendant. The most critical witness in this case was Vilar, who testified that the defendant had gone to AutoZone that night in order to confront the victim about the

break-in, subsequently forced him across North Avenue, and fatally shot him in a secluded area next to the office building. Although Vilar, who was present and a potential suspect in the victim's death, undoubtedly possessed a significant motivation to lie, the account he provided to the jury was corroborated in nearly all relevant respects by the video surveillance footage from the area of the shooting, the various observations made by Bogues and Dixon, the .22 caliber bullet discovered in the victim's leg, the multiple nine millimeter casings discovered alongside of the office building, and—perhaps most important—the defendant's recorded confession. The overlaps between these various pieces of evidence, detailed at length previously in this opinion, made the state's case against the defendant an undeniably strong one.

For these reasons, we conclude that any error by the trial court in precluding arguments related to the absence of an in-court identification from Rodriguez was harmless.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[1] Although the defendant and the victim share the same surname, they are not related. *State* v. *Rivera*, 200 Conn. App. 487, 489 n.1, 240 A.3d 728 (2020).

[2] The police showed footage from these security cameras to a Cadillac dealer in Shelton, who identified this vehicle as a Cadillac DTS manufactured between 2006 and 2011. At trial, the defendant stipulated to owning a 2006 grey Cadillac DTS. Although that particular vehicle was seized by the police and processed for evidence, it was later stolen out of the police department's parking lot.

[3] A thirty-seven second portion of the video surveillance footage from the feed labeled "CAMERA02," which would have captured the initial confrontation between these three individuals and the victim, was not included in the copy of the video surveillance footage introduced by the state at trial. The record contains no apparent explanation for this omission.

[4] A stipulation entered into evidence by the parties indicates that a blood trail found in the area had been left by the victim.

[5] Bogues estimated that the man in white was between five feet, nine inches, and six feet tall. Evidence adduced by the state at trial shows that the defendant matches this description.

[6] Rodriguez testified that he did not see either of the two men in black carrying guns that night, and that he believed the shot came from the man in white.

[7] Although the defendant's motor vehicle registration indicates that his Cadillac is grey; see footnote 2 of this opinion; police officers who subsequently seized and photographed that vehicle indicated that it could appear brown or gold when light hits it. In closing, the prosecutor argued to the jury that the lighting at the scene may have altered the appearance of the defendant's vehicle.

[8] Specifically, the man on that recording states: "As soon as Peto shot him . . . . [the victim] was like Sobe don't kill me, Sobe don't kill me . . . so now, he's looking at *me*, so, if I let him go . . . he can paint a picture and say he know who shot me. If the cops come pick me up, I'm not gonna say nothing, so I'm gonna get charged with it. I know what it is. So I . . . just blacked out, like, I'd rather have him dead that he can't pick me out than being alive and say he shot me." Uncontested evidence adduced by the state during the course of trial indicated that the defendant went by the nickname "Sobe" and that Contreras was also known as "Peto."

[9] Specifically, this court granted the defendant's petition for certification to appeal, limited to the following issues: (1) "Did the Appellate Court correctly conclude that the trial court did not abuse its discretion in admitting into evidence a [DVD] containing an audio recording of a conversation

between . . . Vilar and the defendant?" And (2) "Did the Appellate Court correctly conclude that the trial court did not abuse its discretion when it directed the jury to disregard the portion of defense counsel's closing argument indicating that the state never had asked . . . [Rodriguez] to make an in-court identification of the defendant?" *State* v. *Rivera*, 335 Conn. 975, 241 A.3d 129 (2020).

[10] The defendant does not dispute the fact that Vilar would have been familiar with his voice.

[11] The Appellate Court also declined the defendant's invitation to invoke its supervisory powers to heighten the requirements for admission of electronically stored information. See *State* v. *Rivera*, supra, 200 Conn. App. 502–503. The defendant repeats that invitation in the present appeal, and we likewise decline to accept it. See, e.g., *State* v. *Edwards*, 314 Conn. 465, 498, 102 A.3d 52 (2014) (this court's supervisory powers represent "an extraordinary remedy that should be used sparingly" (internal quotation marks omitted)).

[12] As noted previously, the defendant's arguments with respect to the admissibility of the recording conflate the concept of authentication with the best evidence rule. Although defense counsel did not mention metadata with respect to either of these issues at trial, we pause to note that, to the extent that the defendant now specifically claims on appeal that the absence of metadata associated with the recording on Vilar's cell phone categorically precluded authentication of the copy proffered by the state at trial, that claim lacks merit. An analysis of metadata associated with any digital evidence may be one of several methods by which authentication is either established or challenged, but it is not itself necessary to make a prima facie showing of authenticity for the purpose of admission.

[13] We note that the trial court's admission of the recording in no way precluded defense counsel from arguing to the jury that the recording could not be trusted. Indeed, defense counsel was permitted to argue at length that Vilar, who had a criminal history and experience creating audio files for rap music, had the means, motive, and opportunity to digitally alter—or even wholly fabricate—the recording. Although he did not do so, defense counsel also could have pointed out to the jury that the absence of the original recording meant that the metadata associated with that recording were also missing. We agree with the trial court's initial assessment that such arguments are properly addressed to the finder of fact. See *State* v. *Manuel T.*, supra, 337 Conn. 461 ("[q]uestions about the integrity of electronic data generally go to the weight of electronically [stored] evidence, not its admissibility" (emphasis omitted; internal quotation marks omitted)).

[14] Section 10-2 of the Connecticut Code of Evidence provides: "A copy of a writing, recording or photograph, is admissible to the same extent as an original unless (A) a genuine question is raised as to the authenticity of the original or the accuracy of the copy, or (B) under the circumstances it would be unfair to admit the copy in lieu of the original." Because we conclude that the DVD proffered by the state is admissible as a form of secondary evidence under § 10-3, we need not address the defendant's various claims with respect to this provision. See, e.g., *United States* v. *Lanzon*, 639 F.3d 1293, 1301–1302 (11th Cir.) (conclusion that transcripts were admissible under rule 1004 of Federal Rules of Evidence rendered immaterial question of whether transcripts were duplicates within meaning of rule 1003), cert. denied, 565 U.S. 916, 132 S. Ct. 333, 181 L. Ed. 2d 208 (2011).

[15] Although the defendant also claims that the trial court's ruling violated his constitutional right to the effective assistance of counsel, that particular claim was neither raised in his petition for certification to appeal nor included in the list of questions subsequently certified by this court. See footnote 9 of this opinion. Even if we were inclined to overlook that particular omission and to reach the merits of that constitutional issue, that claim would still fail under the third prong of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). This court's precedent indicates that a violation of the constitutional right to the effective assistance of counsel arises when a defendant is "deprived of the opportunity to raise a significant issue that is reasonably inferable from the facts in evidence." *State* v. *Arline*, 223 Conn. 52, 64, 612 A.2d 755 (1992). The trial court's sua sponte restriction did not, as the defendant claims, "[deprive] the defense of the ability to raise reasonable doubt based on Rodriguez' inability to identify the man in white." As noted subsequently in this opinion, defense counsel was permitted to—and in fact did—argue in favor of that very inference to the jury by repeatedly highlighting the stipulated fact that Rodriguez had failed to pick

the defendant out of a previously administered photographic array.

[16] The trial court also gave a curative instruction with respect to certain arguments made by defense counsel in closing relating to the state's failure to pursue a voice exemplar. See *State* v. *Rivera*, supra, 200 Conn. App. 497. Defense counsel noted that he had a "strenuous" objection to the trial court's instruction relating to the voice exemplars and the grounds for that objection. That particular instruction is not at issue in this certified appeal. See footnote 9 of this opinion.

[17] Because we conclude that any error by the trial court was harmless, we do not reach the question of whether the Appellate Court correctly concluded that defense counsel's arguments relating to the absence of an in-court identification from Rodriguez were improper. By extension, we also do not reach the question of the propriety of the trial court's curative instruction. We note, however, that curative instructions in this context should conform as closely as possible to the model language set forth in *Dickson*. See Connecticut Criminal Jury Instructions 2.6-4, commentary, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited June 13, 2022) (Noting that, in *Dickson*, "the Supreme Court approved the following instruction if requested by the state: 'An in-court identification was not permitted because inherently suggestive first time in-court identifications create a significant risk of misidentification and because either the state declined to pursue other, less suggestive means of obtaining the identification or the eyewitness was unable to provide one.' . . . If requested, do not deviate." (Citation omitted.)).

[18] This observation can be juxtaposed with the evident prejudice that arises in a case in which a witness, despite being unable to identify the defendant in a nonsuggestive, out-of-court procedure, is allowed to definitively identify the defendant as the perpetrator of a crime for the first time in court. See *State* v. *Dickson*, supra, 322 Conn. 439–40 ("the . . . reason that first time in-court identifications are so problematic is that, when the state places the witness under the glare of scrutiny in the courtroom and informs the witness of the identity of the person who has been charged with committing the crime, it is far less likely that the witness will be hesitant or uncertain when asked if that person is the perpetrator").

———————————————